# United States Court of Appeals
## For the First Circuit

No. 05-2736

ALVARO SALIM SILVA,

Petitioner,

v.

ALBERTO GONZALES,
Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Chief Judge</u>,
Lynch and Howard, <u>Circuit Judges</u>.

   <u>Kathleen M. Gillespie</u> and <u>Law Offices of Jeffrey B. Rubin, P.C.</u> on brief for petitioner.
   <u>I. Glenn Cohen</u>, Attorney, Appellate Staff, Civil Division, United States Department of Justice, <u>Peter D. Keisler</u>, Assistant Attorney General, and <u>Thomas M. Bondy</u>, Attorney, Appellate Staff, Civil Division, United States Department of Justice, on brief for respondent.

September 15, 2006

**LYNCH**, **Circuit Judge**.  The petitioner, Alvaro Salim Silva, a native and citizen of Colombia, seeks review of the denial of his application for asylum and withholding of removal.  An Immigration Judge (IJ) found Silva's application for asylum pretermitted, and also concluded that Silva failed to carry the burden of proof with respect to his withholding of removal claim.  The Board of Immigration Appeals (BIA) adopted and affirmed the IJ's decision.  We affirm the BIA and deny the petition for review.

I.

Silva lawfully entered the United States on February 7, 2000.  As a non-immigrant F-1 student, he was authorized to remain for the duration of his status.  However, starting on or about December 23, 2000, Silva stopped attending Massachusetts Bay Community College.

On February 12, 2002, Silva filed an application for asylum and withholding of removal.  In his application, Silva described various incidents of intimidation in his home country of Colombia.  Silva recounted how, in August 1997, the guerrilla organization known as the Revolutionary Armed Forces of Colombia (FARC) bombed one of his family's properties in retaliation for their political views.  He also noted how his support of a "youth group" whose "purpose was to orientate and guide . . . kids" angered the FARC because it made it difficult for the guerrillas to recruit new members.  According to Silva, in June 1998, a FARC

commandant visited the family hacienda in Cumaral and spoke with the foreman about the family's political activities, suggesting that the family should leave the country. The family at that point moved to Bogota "to protect [their] lives." Silva reported that in September of the same year, the FARC paid another visit to the hacienda, this time to express displeasure at the Silvas' failure to leave Colombia. The next day, five dead cows were found on the farm with the initials of the FARC written over the animals' carcasses. After this incident, Silva's parents asked Silva and the older of his two sisters to move to the United States, and on September 9, 1998, they did so.

In December 1999, Silva returned to Colombia, hoping that a recent "peace amnesty" had changed the situation there. However, Silva noted that guerrillas "tried to take over [his] town" on January 10, 2000, and that this prompted his final return to the United States on February 7, 2000. In his asylum application, Silva conceded that he was filing more than one year after his last entry into the United States, but he explained that he "didn't know about the regulation of the law about this matter."

On October 23, 2002, the Immigration and Naturalization Service (INS)[1] initiated removal proceedings against Silva for

---

[1] On March 1, 2003, the functions of the INS were transferred to the Department of Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 471(a), 116 Stat. 2135, 2205 (codified at 6 U.S.C. § 291(a)).

failing to maintain his non-immigrant F-1 student status. Silva admitted the factual allegations in the government's amended Notice to Appear. He also applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), or, in the alternative, voluntary departure.

At the removal hearing on July 9, 2004, Silva testified to many of the same incidents listed in his original application for asylum. When asked why he waited just over two years after last entering the United States to apply for asylum, Silva stated, "I never thought that I was going to end up staying here. Things got worse and worse and that was my only choice." Silva further explained: "[P]eople [are] getting killed by[] the guerrillas all over the place. They are all over the country. You do not know where they actually are. They can just come out, out of the blue, and kill you for no reason." Silva's brother also testified at the hearing as to the events of June 1998.

In an oral opinion, the IJ denied Silva's application for asylum on grounds that he had failed to apply for asylum within one year after the date of his arrival in the United States, and had failed to establish either changed or extraordinary circumstances. The IJ next rejected Silva's application for withholding of removal, finding that Silva had not suffered persecution in Colombia, and noting in passing that the hearsay testimony about

the five slain cows[2] was "the kind of thing that could be substantiated by photographs if it had occurred." The IJ also denied the request for relief under the CAT, observing that Silva had not established fear of torture by, at the instigation of, or with the acquiescence of Colombian officials. The IJ did, however, grant Silva's application for voluntary departure.

Silva timely appealed the denial of his asylum and withholding of removal claims.[3] The BIA adopted and affirmed the IJ's decision, noting briefly that Silva's "failure to produce photographic evidence . . . [was] not, in itself, fatal to his claim," but ultimately agreeing with the IJ that Silva failed to meet his burden of proof for withholding of removal. Silva timely petitioned for review by this court.

## II.

Silva raises three claims on appeal. First, he argues that the IJ erred in finding his asylum application pretermitted. Second, he argues that the IJ erred in finding that he did not suffer past persecution. Third, he argues that the IJ violated his due process rights by requiring photographic evidence to corroborate his testimony. We address each claim in turn.

---

[2] At the hearing, Silva testified that he did not see the cows himself. The foreman had called Silva's father to report the news.

[3] Silva did not appeal the IJ's denial of relief under the CAT.

A.        Asylum

In order to qualify for asylum, an applicant must establish that he is a "refugee."  See 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 1208.13(a).  A refugee is someone who is unable or unwilling to return to his home country due to persecution or a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); see also Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 124 (1st Cir. 2005).

Furthermore, an alien must "demonstrate[] by clear and convincing evidence that the application [was] filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B).  If the one-year filing deadline is not satisfied, "the government may consider an application only if 'the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application.'" Sharari v. Gonzáles, 407 F.3d 467, 472 (1st Cir. 2005) (quoting 8 U.S.C. § 1158(a)(2)(D)).

Silva did not file his application for asylum until February 12, 2002, more than two years after his last entry into the United States on February 7, 2000.  Silva does not dispute this

-6-

fact, but rather argues that changed circumstances excuse his late filing.

Fatal to Silva's argument, however, is our lack of jurisdiction to review determinations of this nature. 8 U.S.C. § 1158(a)(3) states that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." Paragraph (2) of § 1158(a), in turn, addresses both the timeliness of asylum applications and the existence of changed or extraordinary circumstances that may excuse failures to file within one year. Id. § 1158(a)(2); see also Sharari, 407 F.3d at 473; Njenga v. Ashcroft, 386 F.3d 335, 339 (1st Cir. 2004); Haoud v. Ashcroft, 350 F.3d 201, 204-05 (1st Cir. 2003). Here, the IJ found that Silva's asylum application was untimely; he also found that Silva failed to demonstrate changed circumstances. Because these determinations fall within the ambit of 8 U.S.C. § 1158(a)(2), we have no jurisdiction to review the matter.

B.      Past Persecution

To obtain withholding of removal, an applicant must prove that upon return to his home country, "he is more likely than not to face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." See Salazar v. Ashcroft, 359 F.3d 45, 52 (1st Cir. 2004) (emphasis omitted). We have previously stated that "persecution encompasses more than threats to life or freedom, but less than mere harassment

or annoyance." Aguilar-Solis v. INS, 168 F.3d 565, 570 (1st Cir. 1999) (citations omitted).

Silva argues that the IJ erred in finding no past persecution. We review factual findings and credibility determinations under the deferential substantial evidence standard of review. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Singh v. Gonzales, 413 F.3d 156, 159 (1st Cir. 2005). We must uphold the BIA's decision "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

However, we may review a final order of the BIA only if "the alien has exhausted all administrative remedies available to the alien as of right." Id. § 1252(d)(1). Under the exhaustion of remedies doctrine, theories insufficiently developed before the BIA may not be raised before this court. See Olujoke v. Gonzáles, 411 F.3d 16, 22-23 (1st Cir. 2005); Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004). Silva is barred from advancing his past persecution claim. Although he included in his BIA appeal a heading titled, "The IJ erred in finding that respondent had not suffered past persecution in Colombia," Silva failed to put forward a developed argument along these lines. Instead, he focused the BIA's attention on the IJ's statement that the testimony about the five slain cows could have been corroborated with photographic evidence. Silva's narrow argument in his appeal to the BIA is not sufficient to allow a broader inquiry now into the IJ's factual

determination that Silva did not suffer past persecution. In any event, even if we were to reach the merits of Silva's claim, he would not prevail under the substantial evidence standard of review.

C.      Due Process

Silva argues that his due process rights were violated because the IJ placed "unreasonable demands" on him to "corroborate particular experiences." In essence, Silva reasserts his claim that the IJ erroneously discounted testimony about the five cows killed on his family's hacienda.

Again, we review factual findings and credibility determinations under the substantial evidence test. See Elias-Zacarias, 502 U.S. at 481; Singh, 413 F.3d at 159. With respect to the slain cows, the IJ stated that Silva's and his brother's testimony was "unconvincing" because it was "based upon the statement of a FARC guerrilla to a foreman of [Silva's] father's ranch, the statement then of the foreman of the ranch to the respondent's father and then the statement of [Silva's] father to [Silva]." The IJ noted that, although hearsay evidence is admissible in immigration hearings, "this sort of triple hearsay evidence is not very probative and is unreliable." Furthermore, the IJ observed that Silva's father, mother, and younger sister all continued to live unharmed on the family's properties in Colombia. The IJ also thought it was curious that Silva claimed to be afraid

-9-

to return to Colombia ever since his last entry into the United States on February 7, 2000, even though his older sister, who was subject to similar treatment by the FARC, "returned to Colombia in November of 2000 and then again at some point in time in 2001 according to the testimony of [Silva's] brother."

Based on these observations, the IJ discounted the testimony regarding the slain cows and ultimately did not find that Silva had suffered persecution in Colombia. The BIA affirmed this decision, noting that even without considering the absence of photographic evidence, Silva failed to meet his burden of proof. We cannot say that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Rodriguez-Ramirez, 398 F.3d at 123.

The petition for review is denied.