# United States Court of Appeals
## For the First Circuit

No. 06-2135

MUHAMMAD BUTT, AMA ZUBAIR, MEHREEN ZUBAIR,
NIMRA ZUBAIR, AND SHAZIA BUTT,
Petitioners,

v.

PETER D. KEISLER,[*] ACTING ATTORNEY GENERAL,
Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before
Lynch, Circuit Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.

Robert D. Watt, Jr., on brief for petitioners.
Peter D. Keisler, Acting Attorney General, David V. Bernal, Assistant Director, and Lindsay E. Williams, Attorney, Office of Immigration Litigation, U.S. Department of Justice, on brief for respondent.

November 1, 2007

---

[*]On September 17, 2007, Peter D. Keisler was named Acting Attorney General. We have therefore substituted Acting Attorney General Peter D. Keisler for Alberto R. Gonzales as the respondent. See Fed. R. App. P. 43(c)(2).

**CYR**, <u>Senior Circuit Judge</u>.  Muhammad Butt ("Butt"), his wife and three daughters, all citizens and nationals of the Islamic Republic of Pakistan (Pakistan), petition for review of a Board of Immigration Appeals (BIA) order affirming an immigration judge's denial of their applications for asylum.  8 U.S.C. § 1158(a).  We now deny their petition.

**I**

**<u>BACKGROUND</u>**

In March 2002, the petitioners attempted to enter the United States at Boston without valid entry documents, <u>see</u> <u>id.</u> § 1182(a)(7)(A)(i)(I), and the respondent commenced these removal proceedings against them.  The petitioners denied removability and submitted applications for asylum alleging that they had been subjected to persecution in Pakistan on account of their religion.  <u>See</u> <u>id.</u> § 1101(a)(42)(A).

At a hearing before an immigration judge (IJ), Butt, a Sunni Muslim, testified that for more than thirty years he had owned and resided in a house in Lahore directly opposite an "imambargah," a religious shrine operated by Shi'i Muslims.  Pakistan has a continuing history of violence between the majority Sunni and minority Shi'i sects.  During the first month of each Muslim calendar year, the Shi'is held large-scale religious rites at the imambargah, and Butt gave the Lahore police permission to use the top two floors of his multi-story residence to monitor

-2-

these activities for security purposes.

In November 2000, Butt decided to sell the top floor of his residence, and Azhar Hussein, a Shi'i Muslim affiliated with the imambargah, approached Butt with his concerns that the imambargah's security might be threatened if Butt were to sell to "somebody from outside," and offered to purchase the entire residence from Butt. Butt informed Hussein that he did not want to sell the entire building, but only its top floor. Hussein told Butt that he would need to contact other members of his group to determine how they wished to proceed. Butt testified that Hussein was not aggressive during their initial encounter, and that Butt did not sense any "bad threat."

In January 2001, Hussein again approached Butt, and advised him that, even though Butt did not want to sell the entire residence, Hussein's associates still wanted Butt to do so. Butt reiterated his position that he wished to sell only the top floor, and added that he did not want to sell to Shi'is. Hussein advised Butt that it would be preferable if Butt were to sell the entire residence, that he did not "feel good about [Butt's] decision," and that Butt needed to "think about that" and to have a "good, good answer" when Hussein returned. Prior to parting, Hussein urged Butt to remember that a religious group recently had kidnaped and murdered one of Butt's Shi'i acquaintances elsewhere in Pakistan. Butt testified that Hussein's insistence on purchasing the entire

-3-

residence seemed a "little bit aggressive," and although he did perceive Hussein's veiled allusions as a "general warning" and a "sign of danger," he sensed no "bad kind of threat at that time." Butt nonetheless visited the Lahore police, where he was advised that the police would accept his formal complaint against Hussein if he insisted, but warned that complaints filed by a Sunni against a Shi'i often resulted in the complainant being kidnaped or murdered, but that Hussein "won't do anything serious" if Butt refrained from filing a complaint. Butt decided against filing a complaint.

In March 2001, Butt traveled to the United States on business. While Butt was away, Hussein phoned Butt's wife and expressed surprise that Butt had left the country prior to responding to Hussein's outstanding offer to purchase the house. The Hussein phone call induced no fear in Mrs. Butt.

In August 2001, Mrs. Butt agreed to sell the entire residence to a Sunni. When Hussein phoned Mrs. Butt, she informed him of the pending sale, and asked that he not phone her again. Hussein became angry, and told Mrs. Butt that she had not done a "good thing." Mrs. Butt was afraid. As requested, Hussein made no further attempts to contact petitioners. At around the same time, two unknown persons pointed at and followed Mrs. Butt and her daughter as they left a hospital, and two unknown persons unsuccessfully attempted to pick up the Butt children from their

school.  When informed of these events, Mr. Butt told his wife to move the family to her mother's house several miles away.

Mr. Butt returned to Pakistan from the United States in November 2001.  At that time, Butt did not consider emigrating with his family to the United States to seek asylum, even though the petitioners all had the appropriate visas.  In March 2002, the petitioners left Pakistan for the United States.  Butt gave his mother (who continues to live in a house near the imambargah without incident) power of attorney to complete the sale of his residence to the Sunni buyer.

The IJ denied the petitioners' applications for asylum, after finding that they failed to establish either past persecution or a well-founded fear of future persecution, inasmuch as neither Hussein's "veiled threats" during the negotiations for the sale of the Butts' residence nor the two stalking incidents in August 2001 rose to the requisite level of "persecution" on account of their religious affiliation, as required for a grant of asylum.  See 8 U.S.C. § 1101(a)(42)(A).  Additionally, the IJ cited Butt's failure to request asylum during his business trips to the United States in March and August 2001, his voluntary return to Pakistan on each occasion despite the previous Hussein "threats," and his mother's continuing and uneventful residence near the imambargah.  Since petitioners failed to satisfy the less rigorous burden of proof for asylum applications, the IJ denied their requests for withholding

of removal.  On appeal, the BIA affirmed.

## II

## <u>DISCUSSION</u>

The petitioners contend that the IJ made three reversible errors in arriving at the decision that petitioners failed to establish either past persecution or a well-founded fear of future persecution, and thus were not entitled to asylum.  First, petitioners argue that the IJ erroneously construed the Butt testimony by finding that Butt had made two separate trips to the United States in March and August 2001, whereas Butt testified that he made only one trip, arriving in the United States in March 2001 and remaining until November 2001.  Petitioners assert that this factual error was prejudicial because the more occasions that Butt came to the United States and returned to Pakistan without seeking asylum, the more doubtful the proposition that Butt's alleged fear of Hussein was genuine.  Second, petitioners assert that the IJ wholly ignored their documentary evidence of continuing and widespread sectarian violence in Pakistan, and the government's inability or unwillingness to protect its citizens from that violence. Finally, the petitioners maintain that the IJ improperly speculated, without any supporting record evidence, that Butt's mother had not received any threats after the petitioners left for the United States, and improperly relied on that speculative inference because Hussein had never expressed any intention to

include Butt's mother in his threats.

Because the BIA discussed and affirmed the legal and factual bases of the IJ's decision, we review both the IJ's and the BIA's decisions. See Zheng v. Gonzales, 475 F.3d 30, 33 (1st Cir. 2007). We deferentially review their findings of fact and their credibility determinations under the "substantial evidence" rubric, and must affirm unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006).

In order to secure a grant of asylum, petitioners bore the burden to prove they are "refugees," viz., that they are "unable or unwilling to return to, and [are] unable or unwilling to avail [themselves] of the protection of, [their] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see 8 C.F.R. § 1208.13(a),(b). Thus, petitioners must prove either that (i) they have suffered from past persecution on account of one or more of the five grounds enumerated in § 1101(a)(42)(A), Fesseha v. Ashcroft, 333 F.3d 13, 18 (1st Cir. 2003) (noting that alien "must provide 'conclusive evidence' that they were targeted based on one of the five asylum grounds") (citation omitted), which proof would generate a rebuttable presumption that their fear of future persecution is well-founded, Nikijuluw v. Gonzales, 427 F.3d 115,

120 (1st Cir. 2005); see 8 C.F.R. § 208.13(b)(1); or (ii) their fear of future persecution is well founded, viz., that the record evidence demonstrates that they genuinely harbor such a fear, and that it is objectively reasonable, Negeya v. Gonzales, 417 F.3d 78, 82-83 (1st Cir. 2005) (focusing on whether a "reasonable person" would harbor a fear in comparable circumstances).[1]

## A.   **Past Persecution**

Before the BIA, petitioners did not challenge the IJ's conclusion that they failed to prove past persecution, but only the decision that petitioners did not establish a well-founded fear of future persecution.   We need not review any argument that a petitioner does not squarely present before the BIA.   Silva v. Gonzales, 463 F.3d 68, 72 (1st Cir. 2006); 8 U.S.C. § 1252(d)(1).

Moreover, even if the petitioners' argument were not waived, we would not reverse the IJ's determination, since it is amply supported by substantial record evidence.   See Silva, 463

---

[1]To establish their entitlement to withholding of removal, see 8 U.S.C. § 1231(b)(3) (noting that an application for withholding of removal is an implied component of every asylum application); 8 C.F.R. § 1208.3(b), the Butts had the burden to establish a "clear probability" that, if they returned to Pakistan, their lives or freedom would be threatened on account of one or more of the five grounds enumerated in § 1101(a)(42)(A). Ang v. Gonzales, 430 F.3d 50, 58 (1st Cir. 2005). If the Butts cannot establish the "past persecution or well-founded fear" standard for asylum, however, they automatically fail to satisfy the more rigorous "clear probability" test for the withholding of removal. See Nelson v. INS, 232 F.3d 258, 261 n.2 (1st Cir. 2000). Hence, the Butts do not seek our review of the BIA's denial of withholding of removal.

F.3d at 72 (finding waiver, but reaching the merits as an alternative ground for denying the petition). "'[E]stablishing past persecution is a daunting task,' and [petitioners] 'bear[] a heavy burden.'" Alibeaj, 469 F.3d at 191 (citation omitted). "[F]or purposes of establishing the right to asylum, the discriminatory experiences must have reached a fairly high threshold of seriousness, as well as some regularity and frequency." Id. "The baseline rule is that past persecution requires 'more than mere discomfiture, unpleasantness, harassment, or unfair treatment.'" Susanto v. Gonzales, 439 F.3d 57, 59-60 (1st Cir. 2006) (citation omitted). Further, petitioners' evidence must conclusively establish that the persecutors' actions were motivated by race, religion, nationality, membership in a particular social group, or political opinion. Fesseha, 333 F.3d at 18; see Toloza-Jimenez v. Gonzales, 457 F.3d 155, 160 (1st Cir. 2006).

The IJ's erroneous finding of fact that Butt made two trips to the United States in 2001, rather than one, was at most harmless error, which did not affect the outcome of the IJ's decision, Harutyunyan v. Gonzales, 421 F.3d 64, 70 (1st Cir. 2005); see 8 C.F.R § 1003.1(e)(4)(i), given that the record contains other substantial evidence that the incidents petitioners experienced in 2001 did not rise to the level of persecution on account of their religion.

Butt himself testified that he and his wife did not perceive their initial encounters with Hussein as especially serious threats. Rather, Butt described Hussein as a "little bit aggressive," and viewed Hussein's statements as a "general warning," rather than a "bad kind of threat." Similarly, the two stalking incidents by strangers during August 2001, which resulted in no actual physical harm to the petitioners, are not so ominous as to compel an agency finding of persecution. See Nelson v. INS, 232 F.3d 258, 263-64 (1st Cir. 2000) (compiling cases wherein the agency's no-persecution finding was upheld despite evidence of, inter alia, arrest, imprisonment, interrogation, beatings, torture, and food deprivation); Lim v. INS, 224 F.3d 929, 936 (9th Cir. 2000) ("Threats standing alone [ ] constitute past persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual 'suffering or harm.'")(citation omitted). Finally, petitioners, who all possessed valid exit visas, felt no urgency in seeking asylum until seven months after the last act of alleged discrimination, and indeed, Butt voluntarily returned to Pakistan in November 2001 without seeking asylum.

Nor is there compelling or conclusive record evidence that these incidents necessarily were motivated by petitioners' religious affiliation. See Toloza-Jimenez, 457 F.3d at 160. Hussein's pique (e.g., his statements that he did not "feel good

-10-

about [Butt's] decision," that Butt needed to "think about that," and have a "good, good answer") was not obviously motivated by Butt's religious views; indeed, it seems a fairly typical reaction of a buyer faced with a seller's recalcitrance in culminating a sale that the buyer believes will be financially and mutually advantageous.  Hussein's parting comment that Butt should remember that a religious group recently had murdered a prominent Shi'i (viz., not a Sunni like Butt) most likely harkened back to Hussein's prior comments about the imambargah's security concerns should the Butt residence be sold to an unknown Sunni, and was not a veiled threat that the Shi'is planned similarly to target Butt. Indeed, Butt was the first to inject the religious issue into these negotiations by stating that he would not sell his house to any Shi'i Muslim, whereas Hussein told Butt that his Shi'i colleagues would be happy if the Butts, who were Sunni Muslims, stayed on in the residence.  The two non-violent stalking incidents in August 2001, which involved two persons unknown to petitioners, cannot be traced back to Hussein or the Shi'is.

Thus, even if the Butts had not waived their challenge to the IJ's determination anent past persecution, we would not disturb it.

## B.    **Future Persecution**

Petitioners next contend that the IJ lacked substantial evidence for the determination that they failed to establish a

well-founded fear of future persecution.  Once again we are unpersuaded.

Petitioners had the burden to establish, inter alia, that a "reasonable person" in their circumstances would fear persecution on account of his or her religion if returned to Pakistan.  Diab v. Ashcroft, 397 F.3d 35, 41 (1st Cir. 2005).  As we have noted, the petitioners failed to prove any past persecution, thus failed to generate any rebuttable presumption that their asserted fear of future persecution is well-founded, Nikijuluw, 427 F.3d at 120, viz., that their belief that any persecution awaits them upon their return to Pakistan is objectively reasonable.

Petitioners contend that the IJ ignored their documentary evidence regarding reports of ongoing sectarian violence in Pakistan.  Yet the IJ's decision explicitly lists petitioners' documents as relevant exhibits.  See Tota v. Gonzales, 457 F.3d 161, 168 (1st Cir. 2006) ("'[I]n the absence of clear evidence to the contrary, courts presume that [government agencies] have properly discharged their official duties.'")(citation omitted).  Although the IJ ultimately decided not to mention the relevance or weight of this documentary evidence as a ground for his decision, the IJs need "not discuss ad nauseum every piece of evidence, [and] [s]o long as the IJ has given reasoned consideration to the evidence as a whole, made supportable findings, and adequately explained her reasoning, no more is exigible."  Pan v. Gonzales,

489 F.3d 80, 87 (1st Cir. 2007).

Further, the petitioners' generalized evidence relating to Pakistan's sectarian strife would not compel a finding that the petitioners' fear (viz., that they will face such religious violence if they return to Pakistan) is objectively reasonable. "'[E]vidence of widespread violence and human rights violations affecting all citizens is insufficient to establish persecution.'" Harutyunyan, 421 F.3d at 70 (citation omitted). Further, violence by private citizens (viz., Hussein and his colleagues), absent proof that the government is unwilling or unable to address it, is not persecution. Raza v. Gonzales, 484 F.3d 125, 129 (1st Cir. 2007)("When an asylum claim focuses on non-governmental conduct, its fate depends on some showing either that the alleged persecutors are aligned with the government or that the government is unwilling or unable to control them."). Petitioners were unable to "forge a link between the harm asserted and some governmental act or omission." Harutyunyan, 421 F.3d at 67. The Lahore police told Butt that they were willing to take his complaint against Hussein if he insisted, but merely advised him that Hussein "won't do anything serious" unless Butt were to file a complaint.

Finally, the petitioners argue that the IJ improperly relied on the fact, nowhere established in the record, that Butt's mother continues to live safely and unharassed in the same neighborhood as the imambargah because Hussein never purported to

threaten Butt's mother.  First, the IJ reasonably supposed that petitioners had every incentive to adduce evidence if Butt's mother continued to be subjected to religious persecution after their departure for the United States.  See Colon-Millin v. Sears Roebuck de P.R., 455 F.3d 30, 34 n.2 (1st Cir. 2006).  Second, even if Butt's mother was not an original target of the Hussein "threats," the IJ reasonably could infer that her power-of-attorney status, her role in completing the sale of the residence in Butt's behalf and absence, and her continued residence in the same neighborhood as the imambargah would make her a likely target for anyone seeking revenge against the petitioners.  See Boukhtouchen v. Gonzales, 498 F.3d 78, 81 n.3 (1st Cir. 2007) ("'[T]he fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits his return.'")(citation omitted).

We therefore conclude that the IJ and the BIA relied upon substantial record evidence to support the determination that the petitioners had failed to prove either past persecution or a well-founded fear of future persecution, and that they therefore were not eligible for asylum or withholding of removal, see supra note 1.

**The petition for review is denied.**