# United States Court of Appeals
## For the First Circuit

No. 10-1627

VANTHA PHENG,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Thomas Stylianos, Jr., on brief for petitioner.
Kristin A. Moresi, Trial Attorney, Office of Immigration Litigation, Tony West, Assistant Attorney General, Civil Division, and Shelley R. Goad, Assistant Director, on brief for respondent.

May 12, 2011

**LYNCH**, **Chief Judge**. A Cambodian woman, Vantha Pheng, petitions for review of the denial of her applications for asylum, withholding of removal (WOR), and relief under the Convention Against Torture (CAT). We will assume familiarity with the standards for granting such relief from removal and with the deferential substantial evidence standard of judicial review, under which we will reverse the decision of the Board of Immigration Appeals (BIA) only if "a 'reasonable adjudicator would be compelled to conclude to the contrary.'" Castillo-Diaz v. Holder, 562 F.3d 23, 26 (1st Cir. 2009) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review the decision of the BIA and "those portions of the [Immigration Judge]'s opinion that the BIA has adopted." Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004).

Pheng entered the United States on a six-month visitor visa in December 2002, and in June 2004 was issued a Notice to Appear for overstaying that visa. Before an Immigration Judge (IJ), she conceded removability and pursued an application she had filed in October 2003 for asylum, WOR, and CAT relief. Previously, in 2000, Pheng had attempted to enter the United States using a false photo-substituted passport and visa. She was interviewed at the Newark airport, but she refused to reveal her true identity and stated that she had no fear of returning to Cambodia. She was removed subject to an order of expedited removal. Pheng failed to

-2-

disclose this information on her 2003 asylum application and initially lied about it at her asylum hearing.[1]

All told, the IJ conducted six hearings over nearly four years, with Pheng testifying at three of the hearings. The IJ found Pheng's testimony credible in part, but held that she had not met her burden to show she had been or would be persecuted, and so did not qualify for asylum or WOR. The IJ also found she had not demonstrated eligibility for protection under the CAT. The IJ detailed several reasons for the decision.

First, even accepting that certain misfortunes had happened to Pheng and her husband between 1996 and 2000, a period during which they campaigned and demonstrated in support of the opposition Sam Rainsy party, none of these misfortunes rose to the level of persecution.[2] Second, Pheng, who had argued that her

_____

[1]   On cross-examination at her asylum hearing, when initially asked whether she had ever been to the United States before she came in 2002, Pheng answered, "No, never." When confronted with evidence of her earlier fraudulent attempt to enter, Pheng eventually admitted this denial was a lie. She also claimed that she had intended to apply for asylum in 2000 and had been afraid to return to Cambodia, but had panicked when interviewed. The Immigration Judge (IJ) found that the transcript of that interview, far from revealing anything indicating panic on Pheng's part, rather revealed that Pheng "was sticking to a particular story and refused to budge from it."

[2]   Pheng testified that in 1996 and 1998, members of a rival party came to their home and threatened them with harm; in 1997, they fled to the Thai border for several months during a coup d'état, returning to find their home and shop vandalized; in 1998, police officers chased them, hit Pheng on the back, and struck Pheng's husband and detained him overnight when the couple participated in a demonstration protesting electoral fraud; in

husband's killing in 2003, after she had fled Cambodia, buttressed her own claim of persecution, had failed to provide any evidence other than her own surmise that her husband's reported death was on account of political opinion. Third, Pheng had not shown that her remaining family in Cambodia, including her father, sister, and two children (who remained with Pheng's father), had suffered any harm. Fourth, despite repeated warnings that her credibility was at issue and ample time during continuances to secure affidavits from family members who were well-placed to corroborate her story, Pheng had failed to produce any such corroborating evidence.[3] There is ample

---

October 2000, they were prevented by police from handing out provisions at a Buddhist temple; and in November 2000, a friend who was also a member of the political opposition was killed, and Pheng's husband, assuming that the killing was politically motivated, fled the following day.

[3] Eventually, in September 2008, without explanation for the delay, and despite her earlier testimony that "in Cambodia you don't have [a] birth certificate," Pheng produced some basic documents: an extract of her husband's death certificate, extracts of her children's birth certificates, and an extract of her marriage certificate, all dated November 17, 2006. We point out that while the BIA erred in saying that Pheng had produced no death certificate for her husband, that error was immaterial to Pheng's claims of persecution and harmless, as nothing in the extract of the death certificate provided any information about the circumstances of the man's death.

Notably absent from Pheng's documentation was any statement from any family member corroborating her accounts. This was particularly significant because, while testifying about a series of rapes she endured in Cambodia, Pheng testified that family members were present the last time the rapist appeared at her door and that she told her father and her sister everything about the rape. This is not an instance in which the trier of fact would be compelled to conclude that corroborating evidence is unavailable. 8 U.S.C. § 1252(b)(4).

evidence in the record to support these four conclusions, and so we turn to the central point of Pheng's claims.

Pheng's petition for review focuses mainly on the IJ's finding that Pheng's testimony that she was raped by a Cambodian policeman, while credible, did not satisfy Pheng's burden to prove she had been persecuted on account of a protected ground. See Anacassus v. Holder, 602 F.3d 14, 19 (1st Cir. 2010) (explaining petitioner's burden of proof). We describe Pheng's testimony.

Pheng's husband left home in late November 2000 after a friend who was also part of the political opposition was killed, and Pheng had no contact with him or knowledge of his whereabouts after he left. In April 2001, while Pheng's children were visiting family for the Cambodian New Year holiday and Pheng was at home alone, a policeman described in Pheng's written application as a captain knocked on the door. When she asked the policeman who he was looking for, he said he wanted to give Pheng information about her husband. He then pointed his gun at her, pushed her into the house, and raped her. In her asylum application, Pheng wrote that afterward, the man promised to remove her name from a "blacklist." The rapist did not say anything to suggest that he raped her because of her or her husband's political activities.

Pheng said the same policeman raped her four more times but she gave little description of the next three assaults, much less of the reasons, explaining only that he came up with "some

irrational reason to rape me," and that each time, like the first, she was alone at home when the rapist appeared at her door and said he had news about her husband.

She testified she was last raped in September 2002. This time her family was at home with her when the rapist knocked at the door, claiming to have information about Pheng's husband. At the hearing Pheng testified that, at the man's request, she left her home and went with him in his car on a journey of about forty-five minutes. When she refused his sexual overtures in the car, he threatened to kill her and her children if she did not have sex with him. After he raped her, he drove her home. In Pheng's written application, the description was different: Pheng said that the man was furious her family was there, "pretended to arrest" her, and forced her into the car before he drove her into the woods and raped her. In her application, she also said she told her father and sister everything about the rape, and they told her she should leave Cambodia, which she did within three months of the September 2002 rape, leaving her children to remain in Cambodia with her father.

While accepting Pheng's testimony that she had been raped, the IJ found that Pheng had not shown this was persecution.

> The respondent has not proven to this Court's satisfaction that . . . the rapes were politically motivated. As horrendous as they may have been and the Court believes that they occurred, the respondent has not established that she sought safety elsewhere. . . . She continued to live in Cambodia for another two months

-6-

in the same location, continuing to run her business . . . . Again, it does not appear to this Court's satisfaction that the rapes were motivated by anybody seeking to harm the respondent on account of her political opinion or on account of her relationship to her husband, but rather that the individual in question appears to have identified her as vulnerable . . . .

Pheng appealed to the BIA, arguing that the IJ's findings were clearly erroneous, an argument the BIA rejected. The BIA agreed with the IJ that Pheng had not met her burden of showing persecution, particularly her burden of showing that the rapes were politically motivated or that the other harm she suffered rose to the level of persecution. The BIA also pointed to Pheng's failure to produce corroborative evidence. Further, the BIA found that Pheng's disclaimer of any fear of returning to Cambodia during her fraudulent 2000 attempt to enter the United States undermined her claim that she feared future political persecution.

On petition for judicial review, Pheng primarily argues that the IJ was required to find that the rapes constituted political persecution because they were committed by a government officer and because that officer had said he had information about Pheng's husband, who had been politically active and was missing during the period when the rapes took place.[4] There is no such

---

[4] Pheng also argues for the first time in this court that she has been persecuted on account of her membership in the social group of "spouses of Opposition Party members who have fled or otherwise gone missing." She failed to exhaust this claim before the agency, and may not raise it for the first time in a petition for review. 8 U.S.C. § 1252(d)(1); Silva v. Gonzales, 463 F.3d 68, 72 (1st Cir. 2006). The social group claim would in any event

-7-

requirement. Rather, to carry her burden of proving eligibility for asylum, Pheng was required to "provide sufficient evidence to forge an actual connection between the harm and some statutorily protected ground." Lopez de Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007). The record in Pheng's case did not compel the IJ and BIA to conclude that Pheng had established this "critical" causal nexus. See Sompotan v. Mukasey, 533 F.3d 63, 68 (1st Cir. 2008) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992)).

Rape, repugnant as it is, is committed for many reasons, even when committed by government officials. There was no evidence here that the rapes were committed for political reasons, or that the government knew about or authorized the sexual assaults. See Nikijuluw v. Gonzales, 427 F.3d 115, 120-21 (1st Cir. 2005). Pheng's description of the rapes in her oral testimony and written application was sparse, and she did not recount anything the rapist said or did that would support an inference that he was motivated by her or her husband's political activities. In fact, Pheng's mention of the rapist's offer to shield and protect her by getting her named removed from a "blacklist" suggested otherwise.

Nor did anything in the 2002 and 2007 Cambodia country condition reports Pheng submitted substantiate her claim of politically motivated rape. In fact, the reports both stated that while Cambodian law prohibits rape, rape is common in Cambodia.

---

suffer from the same problem as her political opinion claim.

No evidence compelled the IJ or BIA to conclude that the rapes had a nexus to a statutorily protected ground as required to show prosecution.  See Socop v. Holder, Nos. 09-1477, 09-1478, 2011 WL 291094, at *1, *4 (1st Cir. Jan. 31, 2011) (unpublished) (holding that petitioner had not shown her repeated rape was tied to a protected ground).  Rather, as the IJ concluded, the evidence suggested that the rapist took personal advantage of information that Pheng was vulnerable in her husband's absence.  Pheng cannot demonstrate past persecution.

In this court, Pheng has relied exclusively on the rapes in 2001 and 2002 to establish that she fears future persecution of the same type.  Cf. Vilela v. Holder, 620 F.3d 25, 28 (1st Cir. 2010) (describing petitioner's sole reliance on showing past persecution).  However, because Pheng did not establish past persecution, she is not entitled to the rebuttable presumption that she would suffer future persecution.  8 C.F.R. § 1208.13(b)(1); Butt v. Keisler, 506 F.3d 86, 91 (1st Cir. 2007).  And she did not meet her burden of showing any other basis for an objectively reasonable fear of future persecution on a statutorily protected ground.  See Butt, 506 F.3d at 91; Nikijuluw, 427 F.3d at 122.  The asylum claim fails.

Pheng has not argued to this court that the BIA's and IJ's decisions denying her WOR or protection under the CAT were erroneous, and so she has waived both claims.  Nikijuluw, 427 F.3d

-9-

at 120 n.3.  In any event, since the standard for withholding of removal is higher than for asylum, Pheng necessarily failed to meet that burden when she failed to meet her asylum burden.  Villa-Londono v. Holder, 600 F.3d 21, 24 n.1 (1st Cir. 2010).  Nor were the BIA and IJ compelled by the evidence to find that Pheng had shown, as required for protection under the CAT, that it was more likely than not that she would be subject to "severe pain and suffering" at the hands of or with the consent or acquiescence of a "public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); see also Chhay v. Mukasey, 540 F.3d 1, 7 (1st Cir. 2008).

The petition is denied.