STAHL, Circuit Judge.
The petitioners, Yolanda Olmos-Colaj ("Yolanda") and Consuelo Olmos-Colaj ("Consuelo"), natives and citizens of Guatemala, seek review of the denial of their applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge ("IJ") found petitioners' asylum applications to be untimely filed. The IJ also found that petitioners failed to carry their burden of proof with respect to their withholding of removal and CAT claims. The Board of Immigration Appeals ("BIA") adopted and affirmed the IJ's decision. We deny the petition for review.
*171 I. Background
Consuelo and Yolanda, sisters and citizens of Guatemala, are members of an indigenous Mayan group called the Quiché. Consuelo entered the United States in 2000, followed by Yolanda in 2002. Both relocated to New Bedford, Massachusetts, and lived in a community with other indigenous Quiché people.
On March 7, 2007, after an immigration raid on their place of employment, the Department of Homeland Security ("DHS") initiated removal proceedings against Consuelo and Yolanda. Both conceded removability and with the assistance of counsel, filed for asylum, withholding of removal, and relief under the CAT. On their I-589 forms, petitioners stated that they had not been aware of the filing deadlines for asylum applications.
On May 12, 2010, with the assistance of new counsel, petitioners filed revised I-589 forms. Consuelo's updated form indicated that she failed to file a timely application for asylum because she was "too afraid to ask for anything when I arrived. I didn't know asylum was an option for me and I certainly wasn't aware of the deadline."
In 2015, the IJ held a three-day hearing to allow petitioners to present their case. Consuelo, Yolanda, and Dr. Robert P. Marlin testified at the hearing. Consuelo and Yolanda's psychologist, Dr. Jessica Boyatt, was unavailable to testify, but the IJ accepted her written psychological evaluations into evidence without objection.
The testimony encompassed the following: the Guatemalan Civil War occurred during petitioners' childhood. Although no immediate members of their family were harmed, petitioners' "distant uncle" was murdered and their aunt and a cousin were raped. As a result of the level of violence, as well as threats made against petitioners' father, petitioners' mother decided to move the family to Santa Cruz. Petitioners' father remained in San Andrés to run his business.
Petitioners testified that they had a difficult life in Santa Cruz without their father. Non-indigenous people often discriminated against petitioners, calling them by the name "Trixie"-an indigenous word for servant.
In Santa Cruz, Consuelo and her mother helped other indigenous women who were being abused by their employers. She explained that "[t]he police would come with Consuelo and her mother to help the women out, making the women's bosses pay them what was owed."
After attending school in Santa Cruz, Consuelo opened up a store of her own and hired Yolanda as an employee. Occasionally, people would throw rocks at the store and demand to know why an indigenous woman was running a business. Consuelo did not report the incidents to the police because she had no proof of the mistreatment. Consuelo testified that one day, members of the Barrio Norte gang, whom Yolanda referred to as "Ladinos," took some items from the store and refused to pay. One of the gang members hit Consuelo in the head with a rock-she needed stiches for the wound, and a resulting scar was still visible at her hearing before the IJ. The gang also threatened to kill Consuelo if she did not learn her place. Petitioners reported the incident to the police and several of the gang members were arrested. After receiving threats against her life, Consuelo decided not to testify against her attackers and therefore, the men were released from custody.
In 1999, shortly after the incident with the gang, Consuelo closed her store and began teaching for an organization that traveled to native Quiché areas. Subsequently, on one occasion while on her way to work, Consuelo was attacked by two *172 unknown men. They grabbed her from behind and ripped her shirt. The men ran away when they heard other teachers approaching. Consuelo explained that she did not report the attack to the police because she did not have proof. A month after this attack, she stopped working as a teacher.
Consuelo testified that she came to the United States in 2000 because of the threats and humiliation she faced in Guatemala. She did not come earlier because her child was born in 1999. Her first boss in the United States treated her and the other employees poorly. He would make degrading comments about their undocumented status.
Yolanda testified that after Consuelo closed her store, she could not study anymore because Consuelo was her only support system. "The insults Yolanda received at school also influenced her to end her studies." After Yolanda and her then boyfriend, now husband, had a baby, they moved to Patzite and then to Jutiapa to live with her boyfriend's family. While visiting Santa Cruz for a festival in 2001, a "man grabbed Yolanda by the side and told her that he finally found her and that he did not forget that she sent him to jail." The other people around Yolanda were able to convince the man that she was not Consuelo. Yolanda told Consuelo about the incident over the phone and Consuelo told Yolanda that she should come to the United States. Because Yolanda was breastfeeding her child at the time, she did not leave Guatemala right away.
In 2002, Yolanda, leaving her child behind, came to the United States and joined her sister in New Bedford, Massachusetts. She obtained a fake green card and social security card from a coyote. When Yolanda arrived, she was very sick, but explained that she did not go to a doctor because she was "avoiding immigration."
Yolanda and Consuelo testified that they filed for asylum after DHS officers arrested all of the illegal workers in the factory where they were employed. Consuelo testified that "she waited seven years to file her application because she was traumatized when she first arrived .... She did not speak English and the people she lived with when she first arrived did not know anything about asylum. ... She was crying all of the time because she left her very small child back in Guatemala." Yolanda testified that she did not file her asylum application until 2007 because "she did not know she could apply for asylum until she was arrested."
Petitioners testified that several members of their family remain in Guatemala. Petitioners' mother is a homemaker, and their brother is a retired teacher and receives a pension from the Guatemalan government. Yolanda's daughter is currently fifteen years old and lives in Guatemala with petitioners' brother. She attends a private school and Yolanda pays for her tuition.
In denying petitioners' applications for relief, the IJ determined that petitioners were credible "regarding the factual basis of their asylum claims." However, the IJ expressed "serious doubts about Consuelo's most recent explanation as to why she filed her asylum application approximately seven years after her arrival." At the hearing, Consuelo testified that she waited so long because "she did not have the right mindset at the time as she was traumatized from the things that happened to her in Guatemala." However, the IJ compared this testimony to Consuelo's original I-589 form from 2007, where she stated, "I was not aware of the filing deadlines" and to Consuelo's amended I-589 form from 2010, where she stated, "I was very afraid by what had happened to me and I didn't know I could ask for asylum." Based on *173 these responses, the IJ determined that "Consuelo's testimony with respect to her reasons for missing the filing deadline was not credible."
The IJ concluded that neither Consuelo nor Yolanda demonstrated extraordinary circumstances warranting an extension to the 1-year filing deadline. The IJ stated, "as to both of the [petitioners], the Court cannot ignore the reality that the evasive nature of the [petitioners'] presence in the United States played a role in their continued ignorance of the filing deadline."
The IJ determined that in the alternative, even if the late filing were excused, petitioners' asylum applications would still be denied. As to petitioners' claims of past persecution, the IJ found that the only two instances of harm presented-their relocation as children and the attack on Consuelo in her store-were not severe enough or with sufficient regularity to rise to the level of persecution. The IJ also found that any harm suffered by Consuelo and Yolanda at the store was not the result of government action or inaction because the police were willing to assist Consuelo and in fact, had helped Consuelo and her mother to aid other indigenous women when their employers mistreated them.
Moreover, the IJ found that Consuelo and Yolanda did not establish a well-founded fear of future persecution. The IJ explained that although their subjective fear was genuine, it was not objectively reasonable. The IJ explained that the last of the threats took place some fourteen years ago, and the petitioners had presented no evidence as to whether their attackers were still alive or that they continued to hold a grudge. Furthermore, the IJ described how petitioners' mother and brother live peacefully in Guatemala.[1]
Having found that Consuelo and Yolanda failed on their asylum claims, the IJ found that they could not prevail on their claims for withholding of removal or protection under the CAT.
On appeal, the BIA determined that the petitioners were not denied due process by the IJ. The BIA affirmed the IJ's decision, concurring with the IJ's finding that petitioners did not present extraordinary circumstances warranting an extension to the asylum filing requirements. The BIA also found that the IJ did not clearly err in the alternative findings that the petitioners failed to demonstrate past persecution, a well-founded fear of future persecution, or government inaction. As such, the BIA affirmed the IJ's denial of petitioners' asylum and withholding of removal claims, and protection under the CAT.
II. Analysis
Consuelo and Yolanda petition for review of the BIA's decision upholding the IJ's denial of their applications for asylum, withholding of removal, and protection under the CAT. First, petitioners claim that the IJ denied them due process and a fair hearing because he was biased and prevented them from presenting expert testimony. Second, petitioners claim that they established extraordinary circumstances excusing their late asylum application filing. Finally, they argue that they demonstrated both a past and future fear of persecution, as well as government inaction. We address each claim in turn.
*174 A. Due Process
Petitioners argue that the IJ compromised the fundamental fairness of the hearing by preventing petitioners' expert witness from testifying and by exhibiting bias. "We review the question of whether an [IJ's] conduct violates a party's due process rights de novo." Aguilar-Solis v. I.N.S., 168 F.3d 565, 568 (1st Cir. 1999).
With respect to petitioners' claim that the IJ refused to hear testimony from their expert witness, first, the IJ has a right to run a trial as he/she sees fit. See Albathani v. I.N.S., 318 F.3d 365, 375 (1st Cir. 2003) ("[T]he IJ's attempts to expedite proceedings are not the stuff of which a due process violation can be fashioned.") (internal quotation marks omitted). Second, petitioners have waived this issue. On the final day of the hearing, Dr. Bayatt was only available between noon and 1:00 p.m. Given that the hearing had already taken three days, and Dr. Bayatt's availability did not correspond with the regular hearing schedule of the court, the IJ proposed to accept an offer of proof that Dr. Bayatt would testify consistently with her written reports, which were included in the record. Petitioners' counsel acquiesced in the IJ's proposal.
As to petitioners' claim that the IJ exhibited bias by "excessive commentary about time and expediency," the Supreme Court has held that "expressions of impatience, dissatisfaction, annoyance, and even anger," do not amount to bias. Liteky v. United States, 510 U.S. 540, 555-56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Petitioners' counsel represented to the IJ that the hearing would last, in total, approximately three hours. Thus, the IJ's frustration with a hearing that went on for three days was not without reason. Furthermore, despite the IJ's frustration, he clearly told the petitioners that "you can take as much time as you want." While the IJ warned the petitioners about the practical implications of the delay, specifically, that he was unsure about scheduling moving forward, the IJ also told petitioners' counsel that he was not trying to "cut down the amount of time" she spent with her clients. The BIA correctly determined that petitioners had an "ample opportunity to testify and present their case," as such, the IJ did not violate petitioners' due process rights.
B. Asylum Filing
An asylum seeker must "demonstrate[ ] by clear and convincing evidence that the application [was] filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). If the 1-year filing requirement is not met, the government may consider an application "if the alien demonstrates ... extraordinary circumstances relating to the delay in filing an application." 8 U.S.C. § 1158(a)(2)(D) ; see also Silva v. Gonzales, 463 F.3d 68, 71 (1st Cir. 2006).
Petitioners concede that they untimely filed their asylum applications,[2] but claim that they fall within the "extraordinary circumstances" exception. Petitioners argue that the IJ failed to credit evidence from their expert witness concerning how their psychological conditions affected their ability to timely file their asylum applications.
We do not have jurisdiction to review petitioners' challenge to this portion of the BIA's decision. This Court lacks "jurisdiction to review [an] agency's findings *175 regarding timeliness or its application of the 'extraordinary circumstances' exception, 8 U.S.C. § 1158(a)(3), unless an alien identifies a legal or constitutional defect in the decision." Hana v. Gonzales, 503 F.3d 39, 42 (1st Cir. 2007). A constitutional defect challenge cannot be "a disguised challenge to factual findings." Pan v. Gonzales, 489 F.3d 80, 84 (1st Cir. 2007).
Here, the IJ found that neither petitioner qualified for the "extraordinary circumstances" exception to the 1-year filing deadline. Insomuch as this determination was made based on the IJ's credibility assessment of Consuelo, that determination is a finding of fact, and there is no basis by which we can review petitioners' claim. See Hana, 503 F.3d at 42. Likewise, petitioners' assertion that the IJ's decision not to have their expert testify resulted in a due process violation, is to no avail. As discussed above, the IJ's assessment of this issue did not violate petitioners' due process rights. Therefore, we affirm the BIA's decision upholding the IJ's decision to deny petitioners' applications for asylum.
C. Withholding of Removal
Petitioners make a variety of arguments in their petition for review challenging the IJ and BIA's assessment of the asylum factors. Because we find that petitioners cannot succeed on their asylum claim based on the jurisdictional bar described above, we consider petitioners' arguments only for purposes of analyzing their withholding of removal claim. See Pan, 489 F.3d at 85 ("[T]he asylum and withholding of removal analyses are sufficiently analogous that we may treat the IJ's findings of raw fact on the asylum claim as transferable in large part to the withholding of removal claim."). Petitioners' most relevant argument for purposes of this petition is that the BIA erred in upholding the IJ's finding that petitioners failed to demonstrate that they suffered past persecution or had a well-founded fear of future persecution.
Whereas here, the BIA agreed with the IJ's findings and conclusions, but added its own discussion, this Court reviews both decisions. See Arias-Minaya v. Holder, 779 F.3d 49, 52 (1st Cir. 2015) ("Because the BIA adopted and affirmed the IJ's decision yet supplied its own gloss, we review the tiered decisions as a unit."). We review administrative findings of fact under the deferential substantial evidence standard of review. Matovu v. Holder, 577 F.3d 383, 386 (1st Cir. 2009). We must uphold the BIA's decision "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).
"[W]ithholding of removal requires a higher likelihood of persecution than asylum." Aguilar-Escoto v. Sessions, 874 F.3d 334, 337 (1st Cir. 2017). "To obtain withholding of removal, an applicant must prove that upon return to his home country, he is more likely than not to face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Silva, 463 F.3d at 72 (internal quotation marks omitted). As in a claim for asylum, an alien can demonstrate eligibility for relief by showing either that:
(i) he has suffered past persecution on account of a statutorily protected ground, thus creating a rebuttable presumption that he may suffer future persecution if repatriated, or (ii) that it is more likely than not that he will be persecuted on account of a protected ground upon his return to his native land.
*176 Lopez-Castro v. Holder, 577 F.3d 49, 52 (1st Cir. 2009) (internal quotation marks omitted).
"A petitioner must ... show that the persecution is the direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct." Ly v. Mukasey, 524 F.3d 126, 132 (1st Cir. 2008) (internal quotation marks omitted); see also Arevalo-Giron v. Holder, 667 F.3d 79, 83 (1st Cir. 2012) (same). Petitioners claim that "[p]ervasive discrimination exists in all aspects of Guatemalan society [and that] [t]he government cannot protect Ms. Yolanda and Ms. Consuelo." However, substantial evidence supports the BIA's finding that petitioners "did not show that the government of Guatemala condoned the actions of the people that mistreated [petitioners] or that the Guatemalan government is unable or unwilling to protect [petitioners] from the people that they fear."
As to the harm suffered by petitioners in their past, in every instance in which petitioners sought help, the police responded to and assisted the petitioners. The record demonstrates that Consuelo and her mother used police assistance to help other indigenous women in their community. Likewise, after the attack on Consuelo in her store, the government attempted to prosecute the men who attacked her. While it is true that these men were released when Consuelo decided not to testify, the BIA correctly explained that the petitioner's decision to "forego prosecuting the people that harmed her because she feared retaliation by the perpetrators is not sufficient to show that the Guatemalan government is unable or unwilling to protect her." As for Yolanda, she did not seek police assistance after she was threatened by a man who mistook her for her sister.
As petitioners cannot establish past persecution based on the lack of connection between any harm suffered and government action or inaction, petitioners' withholding of removal claim is dependent on their ability to show "a clear probability of future persecution." Lopez-Castro, 577 F.3d at 54. In upholding the IJ's finding that petitioners did not establish a well-founded fear of future persecution, the BIA explained that "the last threatening incident [experienced by Yolanda] occurred more than 14 years ago." Petitioners argue that the IJ's decision fails to account for the "current level of pervasive discrimination that continues to exist in present-day Guatemala." However, the IJ found that while petitioners submitted an "abundance of reports and articles" "summariz[ing] the violence and human rights abuses that have occurred in Guatemala over the last few decades," "[t]his evidence, while informative, does not speak to the particular and individualized fears asserted by [petitioners]." (citing Seng v. Holder, 584 F.3d 13, 19-20 (1st Cir. 2009) (superseded by statute on other grounds)). In affirming the IJ's decision, the BIA explained that petitioners' mother and brother, "who are of the same ethnicity, continue to live in Guatemala and no harm has befallen them." The substantial evidence in the record supports this determination, as such, we must uphold the BIA's decision.
This leaves only the petitioners' claim for protection under the CAT. However, because petitioners have failed to brief this argument in their petition for review, the argument is waived. See Jiang v. Gonzales, 474 F.3d 25, 32 (1st Cir. 2007) ("It is settled beyond peradventure that theories advanced in skeletal form, unaccompanied by developed argumentation, are deemed abandoned.").
The dissent spends many pages discussing the inadequacies of the IJ's and BIA's decisions. The IJ's twenty-nine page opinion *177 more than adequately considered the arguments raised by the dissent. After a hearing that lasted three days, the IJ made the necessary findings based on the evidence presented. The BIA affirmed that decision, noting the relevant portions of the IJ's decision as it considered each and every issue raised on appeal. We again emphasize that we consider the petition for review under the substantial evidence standard. While the dissent acknowledges that the standard applies, as do all the parties to the action, it fails to consider that standard in presenting its arguments.
III. Conclusion
For all the reasons discussed, we deny the petition for review.

The IJ also found that Consuelo and Yolanda did not establish a "pattern-or-practice" claim because the "most current Country Reports reveal that violence in Guatemala is largely indiscriminate and that gangs do not necessarily target any particular social group."

Petitioners did not file their applications for asylum until 2007, more than six years after Consuelo entered the United States in 2000, and more than four years after Yolanda entered the United States in 2002.