# United States Court of Appeals
## For the First Circuit

No. 09-1681

ALEXANDER DÍAZ-GARCÍA,

Petitioner,

v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Robert M. Warren, on brief for petitioner.
Aaron R. Petty, Trial Attorney, Office of Immigration
Litigation, Civil Division, U.S. Department of Justice, Tony West,
Assistant Attorney General, Civil Division, and Christopher C.
Fuller, Senior Litigation Counsel, Office of Immigration
Litigation, on brief for respondent.

June 25, 2010

**TORRUELLA**, **Circuit Judge**.  Petitioner Alexander Díaz-García ("Díaz"), a native and citizen of Colombia, seeks review of an agency decision denying his applications for asylum under Section 208 of the Immigration and Nationality Act (the "Act"), and for withholding of removal under Section 241(b)(3) of the Act and the Convention Against Torture ("CAT").  Díaz, a former teacher and union leader, alleged that he was persecuted by the Revolutionary Armed Forces of Colombia (known by its Spanish-language acronym, "FARC") on account of his union activism in Colombia, and that he fears future persecution if he is forced to return.  The Immigration Judge ("IJ") found Díaz's testimony regarding these allegations not credible, and denied the applications.  The Board of Immigration affirmed without opinion.  After careful consideration, we deny the petition.

## I. Background

### A.  Díaz's Testimony[1]

#### 1.  Early Activism

Díaz was born into a large family in Cali, Colombia in 1967.  In the 1990s, two of his nine brothers were murdered by Colombian guerillas.  Jhony Díaz-García, an older brother, was a prominent businessman killed in 1993 after he refused to comply with extortion demands made by the FARC, a marxist guerrilla

---

[1]  These facts are drawn from the petitioners' testimony before the IJ.  As we discuss, the IJ deemed portions of this testimony not credible.

organization. Another brother, Alonso Díaz-García, was a community leader active in the local Liberal Party who was shot by guerrillas on account of his support for various human rights initiatives and his opposition to the FARC. Most of Díaz's surviving family members continue to live in the Cali area.

As a young teenager, Díaz was politically active in Cali's Liberal Party, acting as a go-between for party leaders and community groups on various local issues. In high school, Díaz served as a Classroom Representative on the Student Council, where he advocated for improvements to the quality of public education. Later, as a student at the University of Santiago de Cali, Díaz joined the Advisement Staff, where he advocated for better classroom and laboratory equipment, monitored classmate activities, and counseled other students. At times, he and other students would "go out to the street" to protest the distribution of resources at the University and the increasing costs of education. At no point during this period was Díaz threatened or punished for his activism.

In 1990, Díaz began teaching science at Colegio Calrete, a small, private high school in Cali. In approximately 1994, he moved to a government-run school, also in Cali, where he taught science and math until 2003. Díaz was also actively involved with SUTEV, a teacher's union in the Cali Valley Department. SUTEV had approximately 16,000 members in the Cali Valley, divided among

local branches in each city in the Department. Díaz was eventually elected president of his local branch in the city of Rodanillo. In this role, Díaz coordinated with other union leaders to oppose a series of educational reforms which the Colombian government began to implement in the mid-1990's, including the integration of neoliberal political views into the standard curriculum and the privatization of the country's schools.

In 2000, Díaz attended a meeting of the SUTEV National Congress in Santa Marta, Colombia, where members voted to stage a nation-wide teachers' strike to protest the government's education initiatives. When Díaz and other union members returned to Rodanillo, they organized a series of meetings with local government officials. In these meetings, the officials indicated that they supported the union's goals but, in the end, failed to take action as they had promised. The union eventually went "into the streets" to protest local government corruption. Later, in 2001, the Colombian Federation of Educators, a national teacher's union, held another nation-wide strike, in which Díaz and other SUTEV members participated.

## 2. Encounters with the FARC

According to Díaz's testimony, the nation-wide strike drew the ire of various groups, including the FARC guerrillas, which denounced SUTEV as an enemy. Díaz testified that he then began receiving threats from the guerrillas. Typically, these

-4-

threats took the form of pamphlets or anonymous phone calls threatening to "finish" Díaz and his family if he did not cease his union activities. Díaz initially stated that the threats began in 2001 in connection with the national strike, though he later asserted (as he had in his initial asylum interview) that the threats began in 1999, when SUTEV began to denounce the FARC guerrillas for using the schools as a strategy point. When pressed, Díaz explained that he received his first threatening call in 1999, but that in 2001 the calls became more serious. Díaz initially estimated that he received between five and ten threatening calls. He later stated that he received these threatening calls "very often."

Díaz also testified that he was physically threatened by individuals he believed to be associated with the FARC guerrillas. On one occasion, he was approached by an unknown individual on a motorcycle who warned Díaz that he would "pay with his life" if he did not "resign" from SUTEV. While he initially stated that this threat occurred in April 2002, he acknowledged that it could have occurred at some other time because he had "a problem remembering dates." Díaz also said that on another occasion two men broke into his home and broke his windows. Díaz opined that if his house had not been "well secured" the individuals would have been able to kill him. Díaz failed to mention this incident in his direct testimony.

In his initial asylum interview, Díaz had informed the immigration officer that he had been shot at by guerrillas on two occasions, in 2001 and 2002. When questioned by the government, Díaz explained that, while he had never personally been shot at, his home had been shot at in both years. Díaz did not mention these incidents until after he had assured the IJ that he had recounted all of his encounters with the guerrillas. He explained that he "didn't remember[]."

Díaz reported some of these threats to SUTEV, and later to the local District Attorney, the Mayor, the Governor, and the General Commander of the Police. Díaz submitted into evidence a copy of a police report indicating that he had received threatening phone calls in March and April 2002. Díaz explained that the police reports did not describe the threats he had received in 2001 because he did not begin reporting the threats to the police until 2002. He also asserted that the 2001 threats were not included in the police report because he could not report threats occurring so far in the past. The police report indicated that it was prepared in October 2002, approximately six months after the reported threats had occurred.

In response to Díaz's complaint, the police investigated the threats, tapped his phones, and "watched over" and "supported" Díaz at his home and work. In July 2003, after several months had elapsed, the police discontinued their surveillance and protection

due to a lack of resources.  They advised Díaz to change his phone number and to avoid public places alone or with his family.  Díaz testified, however, that he ignored this advice because he lived a "public life" and it would be an inconvenience to change phone numbers given how many people, particularly professional contacts, had his phone number at the time.  He added that it would do no good to change his number because the threats would continue until he resigned from his position with the union.  The threatening calls ceased, in any event, when Díaz stopped answering calls from unknown phone numbers on his caller ID.[2]

Though he did not change his phone number, Díaz testified that he did relocate to nearby cities in the Cali Valley Department (all within commuting distance of his job) in order to protect himself and his family.  He did not leave the Department, however, because doing so would be "too complicated" and because "everywhere you go they will find you."  Díaz stated that other union members who had left the Cali Valley Department were unable to find work, were assigned to locations "where they had no dignity," or were

---

[2]  Contrary to his testimony on direct examination that he had no contact with the guerrillas between July 2003 and November 2003, Díaz later stated in response to the government's questions that during that period a group of men hung around his work and disparaged union members, which made him "very nervous."  He reported his encounters with these men to the police, but they never investigated and, instead, told Díaz to return if anything out-of-the-ordinary occurred.  No police report was submitted in connection with these encounters.

forced to sleep in classrooms and had lost their homes.  Díaz did not elaborate further.

### 3.  Leaving Colombia

Sometime in 2002, Díaz and his family applied for, and in 2003 eventually obtained, visas so that his children could visit Walt Disney World in Florida.  Díaz stated that his original intention when he obtained the visas was only to vacation in the United States, and then return to Colombia.  When asked why he changed his mind after arriving, Díaz explained:

> When we came here and I started seeing how beautiful this country is, I was talking to various people in regards to the education, my professional formation, and I see that this country has [] very high technology.  [I s]tarted talking to my children to see if they'd like to be here.  . . . I wanted to go back[], but my children told me they [feel] free and happy here.

Díaz also stated, however, that he came to the United States because he "always lived in fear" in Colombia.  In preparation for his trip, Díaz obtained letters and other materials documenting his membership in SUTEV and the threats he had received.  He explained that these materials were intended as "proof and evidence" for unforseen contingencies.

Díaz and his first wife divorced in 2005, and his former wife and his three children returned to Cali, Colombia.[3]  Díaz

---

[3]  Díaz has since remarried to a lawful permanent resident who was, at the time the IJ issued her decision, awaiting United States citizenship.

testified that his family was afraid to return, but because he now works full-time as a security guard he would not have been able to care for his children if they had remained in his custody. He also felt that it was better for the children emotionally to be with their mother. Díaz speaks to his children by phone everyday, and is unaware of any problems that they or his former wife have had since their return. In his opinion, the FARC guerrillas who had previously targeted him and his family were unaware that they had returned to Colombia.

Díaz also acknowledged the changing nature of the FARC guerrilla campaign in recent years, which is corroborated by State Department country reports and other documentary evidence in the record. The FARC is no longer driven by an ideological opposition to SUTEV's activities, but now concentrates principally on drug trafficking, kidnapings, and other criminal activities.[4] He characterized the guerrillas, at present, as "like a distraction." Still, Díaz maintains that the FARC guerrillas continue to view SUTEV as an enemy and will resume, and act on, their previous threats if he returns. Since leaving Colombia, Díaz has learned through conversations with former colleagues that some of his co-

---

[4] Díaz testified: "Today [the FARC guerillas] don't have a position [on public education]. Before, when the guerrillas started, they had a social ideology. But now, . . . they have diverted from that and they are doing narco traffic[ing]. So for us, . . . they don't have an ideology, an educated political ideology."

workers have been threatened or killed. He also states that the guerrillas continue to attack and kill members of the education community, and that his name appears on a list, compiled by the guerrillas, of people involved in political or SUTEV activities.

### B. Agency Proceedings

Díaz was admitted to the United States on a nonimmigrant visitor's visa at Miami, Florida on November 6, 2003. The visa expired on May 4, 2004. Díaz overstayed and, about a month later, filed applications for asylum, withholding of removal, and relief under the CAT, all of which the asylum officer denied. Díaz then conceded removability in the immigration court and, after several continuances to allow Díaz to obtain counsel, a hearing was held before the IJ on April 10, 2007. Díaz testified in support of his allegations of persecution.[5]

On August 7, 2007 the IJ issued a nineteen-page opinion denying Díaz's various applications for relief and ordering his removal to Colombia. The crux of the IJ's decision was a finding that Díaz had not testified credibly.[6] While the IJ found Díaz's testimony "generally plausible in light of verifiable country conditions," she determined that "his testimony in response to

---

[5] Díaz initially requested relief on behalf of himself and his family. He abandoned those derivative claims after his ex-wife and children returned to Colombia.

[6] The IJ did not credit the asylum officer's negative credibility assessment due to the officer's shoddy note-taking and other defects in the record of the asylum interview.

questions regarding his involvement with SUTEV and his subsequent encounters with the guerrillas was vague and lacking in detail, and he often appeared to ramble or 'talk around' a question rather than answer directly." The IJ further explained that Díaz's testimony regarding his allegations of persecution was often inconsistent and, at times, implausible.

The IJ also found that Díaz had failed to establish a pattern or practice of persecution on the basis of his SUTEV membership, or eligibility for CAT relief because, among other things, he had not demonstrated that the Colombian government was responsible for, or was willfully accepting of, the guerrillas' activities, as the Convention requires. See 8 C.F.R § 1208.18(a)(1). The BIA affirmed without opinion, and Díaz filed a timely appeal to this court.

## II. Discussion

### A. Standard of Review

"[W]here, as here, the BIA has adopted the IJ's decision and has not developed an independent rationale, we review the IJ's decision directly." Seng v. Holder, 584 F.3d 13, 17 (1st Cir. 2009). Review of the IJ's "legal rulings is de novo but is deferential as to findings of fact and the determination as to whether the facts support a claim of persecution." Jorgji v. Mukasey, 514 F.3d 53, 57 (1st Cir. 2008). "The [IJ's] fact-bound determinations, including credibility findings, will be upheld,

-11-

provided that they are supported by reasonable, substantial, and probative evidence on the record considered as a whole, such that no reasonable adjudicator would be compelled to conclude to the contrary." Anacassus v. Holder, 602 F.3d 14, 18 (1st Cir. 2010) (internal quotation marks and citations omitted).

### B.  Applicable Law

In a claim for asylum, "the petitioner carries the burden of proving that he qualifies as a refugee by showing either that he has suffered past persecution or has a well-founded fear of future persecution on the basis of 'race, religion, nationality, membership in a particular social group, or political opinion.'" Journal v. Keisler, 507 F.3d 9, 12 (1st Cir. 2007) (quoting 8 U.S.C. § 1101(a)(42)).

> The alien's credible testimony alone may suffice to carry this burden. But the agency is not required to take such testimony at face value; it may discount or disregard the testimony if the trier reasonably deems it to be speculative or unworthy of credence. In the absence of other compelling evidence, an adverse credibility determination can prove fatal to a claim for either asylum or withholding of removal.

Villa-Londono v. Holder, 600 F.3d 21, 24 (1st Cir. 2010)(internal citations and quotation marks omitted); see also Kartasheva v. Holder, 582 F.3d 96, 105 (1st Cir. 2009)("We give great respect to the IJ so long as he provides specific and cogent reasons why an inconsistency, or a series of inconsistencies, render the alien's testimony not credible." (internal quotation marks omitted)).  The

-12-

IJ's negative credibility assessment is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Abdelmalek v. Mukasey, 540 F.3d 19, 22 (1st Cir. 2008) (quoting 8 U.S.C. § 1252(b)(4)(B)).

Díaz filed his claim in June 2004, before the effective date of the REAL ID Act of 2005, Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 302, 303 (effective May 11, 2005). "Thus, the bona fides of the adverse credibility determination in this case are governed by the preexisting 'heart of the matter' rule." Villa-Londono, 600 F.3d at 24. Under this rule, "'an adverse credibility determination may not rest on discrepancies or inconsistencies that are merely peripheral to the alien's claim; instead, the determination must rest on discrepancies or inconsistencies that are central to the claim.'" Id. (quoting Seng, 584 F.3d at 18).

### C. Eligibility for Asylum

In this case, there is no real dispute that the IJ's negative credibility assessment went to the heart of Díaz's claim of persecution. The IJ specifically disbelieved Díaz's allegations regarding his encounters with the FARC guerrillas, and Díaz has asserted no other plausible grounds for entitlement to the relief he seeks. Thus, our review is limited to determining whether the IJ's assessment was supported by substantial evidence.

In her decision, the IJ provided a specific, cogent and persuasive account of why she found Díaz's testimony regarding his

-13-

alleged persecution not credible. The IJ explained that Díaz was vague in his testimony regarding his encounters with the FARC, and attempted to avoid or "talk around" questions regarding his alleged mistreatment, which caused her to doubt his veracity. See Yosd v. Mukasey, 514 F.3d 74, 80 (1st Cir. 2008)(where petitioner's initial "testimony about [] incidents [of alleged persecution] was vague," petitioner's "lack of specificity could reasonably lead the IJ to infer that [his testimony] lacked credibility").[7] The IJ also explained that Díaz failed to mention several key encounters with guerrillas until prompted to do so by the government on cross-examination, and failed to remember significant details, or even the basic timeline, of the events he described. See, e.g., Mam v. Holder, 566 F.3d 280, 283-85 (1st Cir. 2009)(finding significant discrepancies concerning dates of key events with respect to asylum claim sufficient to justify adverse credibility determination); Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 8 (1st Cir. 2008)("[W]hen an alien's earlier statements omit any mention of a particularly

---

[7] The IJ added:

> [Díaz] was . . . not appropriately responsive to questions on direct and cross-examination, and both the [IJ] and his own attorney warned him repeatedly to answer the specific questions posed. However, despite these warnings, [Díaz] continued to provide ambiguous responses that often did not address the question or were so lacking in detail the [IJ] was left without clarification of his prior testimony. Moreover, when asked to explain or clarify his testimony, [Díaz] was often unable to do so, and instead would begin speaking about another (somewhat tangential) topic.

-14-

significant event or datum, an IJ is justified -- at least in the absence of a compelling explanation -- in doubting the petitioner's veracity."); see also Bebri v. Mukasey, 545 F.3d 47, 51 (1st Cir. 2008). The IJ noted that while applicants for asylum "are not required to recollect in detail every encounter with their persecutors, it seems logical that an individual seeking asylum on the basis of his encounters with guerrillas would be able to independently remember and recount major incidents such as a home being broken into or being fired upon." When presented with the opportunity to explain these inconsistencies and other questions raised by his testimony, Díaz could not provide a convincing answer beyond lack of memory.

Finally, the IJ found several aspects of Díaz's testimony implausible and at odds with his claim of persecution. Among other things, Díaz stated that he refused to follow the advice of the police and change his phone number because it would be an inconvenience and did not present "too much of a security [risk]." Despite the alleged threats to his life and his family, he never attempted to relocate to an area outside of commuting distance to his job. Further, his testimony that he came to the United States so that his children could visit Walt Disney World, and chose to remain because of the various educational, economic, and technological opportunities available, was inconsistent with his claim that he fled persecution and remained in the United States

out of fear for his life. See, e.g., Piedrahita v. Mukasey, 524 F.3d 142, 144 (1st Cir. 2008) (affirming denial of asylum claim based on agency's adverse credibility finding where the BIA identified "several material inconsistencies, vague and implausible testimony, and omissions which reached to the heart of the respondent's claim").

Díaz does not really confront the implications of the IJ's adverse credibility finding, but instead asserts that documentary evidence of conditions in Colombia, including State Department reports, supports the conclusion that the FARC guerrillas actively target educators and union leaders like Díaz. However, while "country conditions reports are deemed generally authoritative in immigration proceedings, the contents of such reports do not necessarily override petitioner-specific facts -- nor do they always supplant the need for particularized evidence in particular cases." Seng, 584 F.3d at 20 (internal quotation marks omitted). The IJ found that Díaz failed to provide credible evidence that, on account of his activism, he found himself in the guerrillas' cross-hairs, and we find that the other evidence in the record falls far short of compelling a contrary conclusion. We thus hold that the IJ's negative credibility assessment regarding Díaz's allegations that he was threatened by the FARC Guerrillas was amply supported by a specific and cogent explanation based on

substantial evidence in the record.  As a result, his asylum claim based on past persecution fails.

It also follows, on these facts, that Díaz has failed to establish a well-founded fear that he will be singled out for future persecution.  When a petitioner is unable to demonstrate that he suffered persecution in the past, "he may still qualify for asylum by establishing a well-founded fear of future persecution through 'specific proof' that his 'fear is both subjectively genuine and objectively reasonable.'"  Decky v. Holder, 587 F.3d 104, 110 (1st Cir. 2009)(quoting Castillo-Díaz v. Holder, 562 F.3d 23, 26 (1st Cir. 2009)).  However, because Díaz's testimony regarding his alleged encounters with the FARC guerrillas was not credible, he cannot establish either a subjectively genuine or objectively reasonable fear that he will be individually targeted by those guerrillas on his return.  Indeed, Díaz's ex-wife and children have returned to Colombia with his blessing and without incident.  See, e.g., Budiono v. Mukasey, 548 F.3d 44, 50 (1st Cir. 2008)("The fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits her return.").

Finally, Díaz has failed to establish eligibility for asylum based on a "pattern or practice" of persecution against "a group of persons similarly situated to the applicant" on account of a protected ground.  See 8 C.F.R. § 1208.13(b)(2)(iii)(A).  In

-17-

"extreme cases," a petitioner may qualify for relief "solely based on their membership in a protected group under the pattern or practice rubric." Rasiah v. Holder, 589 F.3d 1, 5 (1st Cir. 2009). However, "[o]ur case law has narrowly defined 'pattern or practice' to encompass only the systematic or pervasive persecution of a particular group based on a protected ground, rather than generalized civil conflict or a pattern of discrimination." Sugiarto v. Holder, 586 F.3d 90, 97 (1st Cir. 2009).

To be sure, the situation in Colombia remains tragically unstable. According to State Department country reports, "[p]aramilitary groups and guerrillas threatened, displaced, and killed academics and their families for political and financial reasons," and 34 teachers were killed by "[v]arious assailants" during the first eight months of 2006. Department of State, 2006 Country Report on Human Rights Practices in Colombia, at *13 [hereinafter "2006 Report"]. Nonetheless, the Colombian government has undertaken various initiatives to address this situation, which have shown "demonstrable" results. Id. For example,

> The Ministry of Education, in conjunction with the Colombian Federation of Educators and the Presidential Program for Human Rights, operated a program for at-risk teachers with 78 regional committees to investigate specific threats against teachers and, in some cases, facilitate relocation with continued employment as educators. Approximately 168 threatened educators were successfully relocated since 2004, raising to 1,500 the number relocated since 2002.

-18-

Id. at *1. This successful relocation program undermines any claim that the guerrillas' persecution of educators is sufficiently "systematic" or "pervasive" to establish a pattern or practice of persecution capable of supporting Díaz's application for asylum. In any event, "an individual who can relocate safely within his home country ordinarily cannot qualify for asylum here," INS v. Ventura, 537 U.S. 12, 18 (2002)(citing 8 C.F.R. § 208.13(b)(1)(I)), and Díaz has failed to demonstrate that relocation in Colombia is not a viable option.

Likewise, while union leaders face similar risks from guerillas and other armed groups, "[t]he government continued its protection program for threatened labor leaders, providing protection measures for more than 1,200 trade unionists during the year." 2006 Report, at *21. We have repeatedly held that "'persecution' implies a governmental link; that is, 'the government must practice, encourage, or countenance it, or at least prove itself unable or unwilling to combat it.'" Méndez-Barrera v. Holder, 602 F.3d 21, 27 (1st Cir. 2010)(quoting López-Pérez v. Holder, 587 F.3d 456, 462 (1st Cir. 2009)). Díaz has failed to demonstrate any link between the FARC guerrillas' persecution of these various groups and any action or inaction on the part of the Colombian government. Indeed, the government's efforts to relocate and protect both teachers and union leaders indicates that the

-19-

government has taken an active role in opposing the guerrillas' activities.

There may be additional problems with Díaz's asylum claim, which we need not address, including whether he has established membership in a cognizable "social group" within the meaning of the immigration laws. See Scatambuli v. Holder, 558 F.3d 53, 59 (1st Cir. 2009)(explaining that "'persecution on account of membership in a particular social group' refers to 'persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic'"); see also Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1198 (11th Cir. 2006)("The risk of persecution alone does not create a particular social group within the meaning of the INA, as virtually the entire population of Colombia is a potential subject of persecution by the cartel."). Because the IJ's determination that Díaz did not testify credibly regarding his alleged persecution by the FARC guerrillas was supported by substantial evidence and cut to the heart of his claim for asylum, and because he has asserted no other grounds for the relief he seeks, we affirm the IJ's denial of his applications.[8]

---

[8] Because Díaz has not established eligibility for asylum, his claim for withholding of removal fails as well. See, e.g., Decky, 587 F.3d at 109 ("[I]f the asylum claim fails, so too does the claim for withholding of removal."). Díaz has not argued that he is entitled relief under the CAT, and so we deem that claim waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-20-

**<u>The petition is denied</u>**.