# United States Court of Appeals
## For the First Circuit

No. 11-2171

OLENA REBENKO and OLEG REBENKO,

Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Daniel D. Estrin and Sirota & Associates, P.C. on brief for petitioners.
Colin J. Tucker, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Tony West, Assistant Attorney General, Civil Division, and Terri J. Scadron, Assistant Director, Office of Immigration Litigation, on brief for respondent.

September 4, 2012

**LYNCH**, **Chief Judge**.  On January 4, 2010, an Immigration Judge (IJ) denied petitioner Olena Rebenko's[1] application for asylum, withholding of removal, and withholding under the Convention Against Torture (CAT).  The Board of Immigration Appeals (BIA) affirmed this denial on September 8, 2011.  Rebenko timely petitions for review of the BIA's decision.  We deny the petition.

I.

Rebenko is a native and citizen of Ukraine who entered the United States on July 1, 2001, on a J-1 non-immigrant visa and then, on September 14, 2004, obtained an F-1 student visa that authorized her to remain in the United States until July 31, 2006.  On October 12, 2004, Rebenko filed an affirmative application for asylum and withholding of removal with the Department of Homeland Security (DHS).[2]  Following an interview, an asylum officer issued a notice of intent to deny Rebenko's application on September 11, 2007.  DHS initiated removal proceedings against Rebenko on

_____

[1] Both Olena Rebenko and her husband, Oleg Rebenko, requested asylum, withholding of removal, and protection under the CAT, but Oleg's application was based on the persecution that Olena allegedly suffered in Ukraine.  The applicants appealed the IJ's decision together and both now petition for review of the BIA's decision.  However, given that Oleg's claims are derivative of Olena's, we will discuss only Olena's entitlement to relief, referring to her as "Rebenko."

[2] Based on the government's concession, the IJ found that extraordinary circumstances prevented Rebenko from applying for asylum within one year of her arrival into the United States and that her application for asylum was therefore timely.

September 27, 2007, charging that she had remained in the United States beyond the date her visa allowed.

Rebenko appeared before an IJ on January 8, 2008, denied that she was removable[3] pursuant to 8 U.S.C. § 1227(a)(1)(B), and again applied for asylum, withholding of removal, and protection under the CAT, as well as voluntary departure in the alternative. The IJ conducted a hearing on Rebenko's application on April 20, 2009, at which Rebenko testified. We recount this testimony.

Rebenko was then twenty-six years old and had been of the Pentecostal faith since childhood. She experienced problems while living in Ukraine because of her faith. In May of 1999, she had gathered with her grandmother and "other religious brothers and sisters" for a meeting when the police interrupted the meeting, took the congregants to the police station, and detained them in a cell. One of the guards took her to meet with an investigator, who slapped her and told her that she should not follow in her grandmother's footsteps and that "he wouldn't stand for any Pentecostals living in the city." The investigator threatened her life for "spreading religious disease among his people." Rebenko conceded that it is not illegal to be Pentecostal in Ukraine and that the worshipers secured their release by paying a bribe after being detained for less than eight hours.

---

[3] Despite this initial denial of removability, Rebenko has not since pursued this issue and it is accordingly waived.

After this, Rebenko and her grandmother received about five phone calls at their home from "nationalists" who told them "that they would kill [them] and that they wouldn't be playing easy games just like [the] police did with [them], and that they hated Pentecostals and that Pentecostals would not live." Rebenko "believe[d] that the police informed the nationalists." Her grandmother reported a few of these calls to the police, but the record does not reveal whether anything came of these reports.

On June 23, 2000, at Rebenko's high school graduation, "students called [her] names and basically yelled out that Pentecostals did not deserve to get [an] education." Though the principal tried to calm the students, Rebenko "could tell that [the principal] enjoyed the mockings [sic] because she was also Orthodox Christian."

On the way home from the graduation ceremony "a bunch of skinheads" followed Rebenko; when she attempted to run from them, they caught up to her, knocked her to the ground, and beat her, causing injuries to her face and "the sides of [her] body." One of the attackers put a knife to Rebenko's throat, threatened to rape and kill her, and said "this would not happen to [her], again, if [she] weren't Pentecostal." When passers-by approached, Rebenko's assailants left and Rebenko ran home, crying, to her grandmother, who took her to the police station to file a report; the police then sent Rebenko to the hospital for medical attention. After

receiving no word as to the progress of the case, Rebenko and her grandmother inquired with the police, who told them that the case had not yet been resolved.  Though Rebenko did not specifically identify her attackers to the police, their identities were well-known within the community, and she "believe[d] the investigator just didn't like [her] because [she] was Pentecostal and didn't do anything to pursue the case."

About a year later, Rebenko left Ukraine for the United States; she testified that she "left Ukraine because [she] was afraid for [her] life" and that she had not since returned. Rebenko acknowledged that since her departure from Ukraine, the Ukrainian authorities had not contacted her in any way.  Rebenko asserted, however, that were she to return to Ukraine, would-be persecutors would recognize that she was Pentecostal because she would have to register with the police, she would dress and behave differently than the rest of the population on account of her religion, and everyone within her community knew each other.

Rebenko also presented testimony from Igor Kotler, a professor of history at the University of Phoenix whom she proffered as an expert on religious minorities in Ukraine.  The IJ qualified Kotler as an expert due to his authorship of an article on non-Orthodox Christian denominations in Russia.  Kotler conceded that he had not been to Ukraine since 2002, that he had not written

or published any works regarding Pentecostals in Ukraine, and that his education had not focused on the Pentecostal faith.

Kotler testified that the Pentecostal religion was viewed in Ukraine as having "invaded" the country about 200 years ago and that were Rebenko to return to Ukraine, she would be at grave risk of persecution from nationalists. Kotler added that the Ukrainian government does not protect minorities and agreed with Rebenko that a person returning to Ukraine from the United States might have to register with the local authorities. Kotler admitted that while he had testified as an expert in other immigration proceedings, he had never reached any conclusion other than that an alien would be harmed if returned to his or her country. He suggested that this was because he only agreed to testify in meritorious cases.

The record before the IJ included the U.S. State Department's 2007 and 2008 International Religious Freedom Reports. Both reports stated that "[t]he Constitution and the law on freedom of conscience provide for freedom of religion" and that "the Government generally respected this right in practice" or "religious freedom in practice"; both also suggested that government laws and policies "contribute[d] to the generally free practice of religion." The 2007 report documented that Protestant churches had grown "rapidly" since independence, including "growing communities" of Pentecostals.

On January 4, 2010, the IJ issued a decision denying Rebenko's applications but granting voluntary departure. Though the IJ found Rebenko's testimony to be credible, he determined that her experiences in Ukraine, "while no doubt terrifying, do not rise to the level of 'persecution.'" As for Rebenko's fear of persecution, the IJ noted that according to the 2007 International Religious Freedom Report, the government of Ukraine generally respected freedom of religion, Protestant churches were growing rapidly within the country, and the Pentecostal community within Ukraine was growing. The IJ concluded that Rebenko's fear of persecution upon returning to Ukraine -- and Kotler's opinion as to the likelihood of such persecution -- were inconsistent with country conditions. Because Rebenko had demonstrated neither past persecution nor a well-founded fear of future persecution, the IJ determined that she was not a refugee eligible for asylum and denied her application for withholding of removal. The IJ also denied Rebenko's application under the CAT.

The BIA agreed that the incidents Rebenko described did not amount to persecution and that, in light of the International Religious Freedom Report, Rebenko had not demonstrated a well-founded fear of future persecution. It thus dismissed Rebenko's appeal.[4]

---

[4] As the BIA noted, Rebenko did not contest the denial of her application for protection under the CAT.

II.

Rebenko asserts that the IJ and BIA erred by (1) concluding that Rebenko's past treatment in Ukraine did not rise to the level of persecution; (2) requiring Rebenko, in support of her claim for asylum, to show evidence that she was singled out for persecution in the past; and (3) failing to analyze Rebenko's claim under the CAT separately.

Where the BIA affirms an IJ's ruling while analyzing the bases offered for that ruling, we review the IJ's and BIA's opinions as a unit. Hussain v. Holder, 576 F.3d 54, 57 (1st Cir. 2009). In reviewing an order of removal, we consider only the record upon which the order is based, 8 U.S.C. § 1252(b)(4)(A)-(B),[5] and accept administrative findings of fact so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Seng v. Holder, 584 F.3d 13, 17 (1st Cir. 2009) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). We may overrule the BIA's decision only if there is an error of law or "the evidence 'points unerringly in the opposite direction.'" Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005) (quoting Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir.

---

[5] Because Rebenko submitted her application for asylum and withholding of removal on October 12, 2004, the REAL ID Act of 2005 (which became effective on May 11, 2005) does not apply to her. See 8 U.S.C. § 1158 note (Effective Date of 2005 Amendment); Díaz-García v. Holder, 609 F.3d 21, 27 (1st Cir. 2010). In any event, the amendments the REAL ID Act of 2005 introduced would not affect our resolution of Rebenko's petition for review.

2004)). We review the BIA's conclusions of law de novo, Mendez-Barrera v. Holder, 602 F.3d 21, 24 (1st Cir. 2010), and we need not consider any argument that was not squarely presented to the BIA, Butt v. Keisler, 506 F.3d 86, 90 (1st Cir. 2007).

Under 8 U.S.C. § 1158(b)(1)(A), an alien may be eligible for asylum if she is a refugee. An alien can carry her burden of showing this by demonstrating either past persecution or a well-founded fear of future persecution, Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000), on account of, inter alia, religion. 8 U.S.C. § 1101(a)(42)(A). An applicant may demonstrate a well-founded fear indirectly, by relying on a rebuttable presumption arising from a showing of past persecution, or directly, by showing that "(1) she has a fear of persecution in her country of origin; (2) there exists a reasonable probability that she will suffer persecution if she returns; and (3) she is unable or unwilling to return to her country due to that fear." Nelson, 232 F.3d at 264.

"To qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering." Id. at 263. "[F]or purposes of establishing the right to asylum, the discriminatory experiences must have reached a fairly high threshold of seriousness, as well as some regularity and frequency." Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006). Importantly, persecution "always implies some connection to government action or inaction," Harutyunyan v. Gonzales, 421 F.3d

-9-

64, 68 (1st Cir. 2005), and "violence by private citizens . . ., absent proof that the government is unwilling or unable to address it, is not persecution," Butt, 506 F.3d at 92.

Substantial evidence supports the BIA's determination that Rebenko failed to show past persecution. As outlined earlier, Rebenko testified that she experienced mistreatment in Ukraine on account of her Pentecostal faith on four occasions: (1) her arrest in May of 1999; (2) her receipt of threatening phone calls from nationalists following her arrest; (3) the "mockings" she experienced during her graduation in June of 2000; and (4) her beating at the hands of "skinheads." Rebenko did not report any significant mistreatment before May of 1999 or after June of 2000, though she had practiced Pentecostalism since childhood and continued to live in Ukraine until July of 2001. The IJ thus could have reasonably concluded that the mistreatment Rebenko described was not "systematic" but rather was "reflective of a series of isolated incidents" over the course of a particularly unpleasant year. Journal v. Keisler, 507 F.3d 9, 12 (1st Cir. 2007) (quoting Bocova v. Gonzales, 412 F.3d 257, 263 (1st Cir. 2005)).

Beyond that, Rebenko describes no nexus between her harassment at her graduation and any government action or omission. Her speculation that the police caused nationalists to make threatening phone calls to her home is not supported by any evidence. As for Rebenko's suggestion that the police

-10-

intentionally failed to bring her "skinhead" assailants to justice, the failure of the police to resolve this case by the time Rebenko inquired about it does not support the inference that they were "unwilling or unable to address" the incident. Butt, 506 F.3d at 92. Though the IJ found Rebenko credible, "[t]reating an alien's factual testimony as credible does not entail acceptance of [her] conclusions as to causation." Morgan v. Holder, 634 F.3d 53, 59-60 (1st Cir. 2011).

While Rebenko's May 1999 arrest is clearly attributable to the Ukrainian government, this was a single incident in which Rebenko was detained for less than eight hours and suffered no injuries requiring medical treatment. A reasonable adjudicator would not be compelled to find that this incident rose to the level of persecution. Indeed, even if we accept Rebenko's invitation to attribute the threatening phone calls and assault to the Ukrainian government, we have found more severe harassment not to constitute persecution. See, e.g., Morgan, 634 F.3d at 58; Susanto v. Gonzales, 439 F.3d 57, 59-60 (1st Cir. 2006); Topalli v. Gonzales, 417 F.3d 128, 132 (1st Cir. 2005); Nelson, 232 F.3d at 264.

We construe Rebenko's second argument as claiming that in considering whether she had demonstrated a well-founded fear of persecution, the IJ and BIA incorrectly required her to show that

-11-

she experienced persecution in the past.[6]  This misreads the analysis.  The IJ explicitly stated that if "the Court finds no past persecution, respondent can still obtain relief based on a fear of future persecution if the respondent can show, on a subjective basis, genuine fear of persecution plus, on an objective basis, that a reasonable person in respondent's circumstances would fear persecution on account of one of the above-mentioned protected grounds."  In light of the State Department's International Religious Freedom Report, the IJ concluded that Rebenko had failed to establish the requisite objective basis, and the BIA agreed.  We find no error in the IJ's statement of the law or in the BIA's adoption of the IJ's analysis.

As for Rebenko's third argument, concerning the IJ's and BIA's failure to independently analyze her request for relief under the CAT, Rebenko did not challenge the IJ's denial of this request before the BIA.  She has thus forfeited this issue.  In any event, Rebenko's attack on the IJ's analysis of her claim for protection under the CAT is utterly without merit.

We deny Rebenko's petition for review.

---

[6] To the extent Rebenko also suggests that the IJ and BIA erred by crediting the State Department's International Religious Freedom Reports instead of Kotler's contrary testimony, the task of weighing such conflicting evidence is committed to the IJ, Negeya v. Gonzales, 417 F.3d 78, 84 (1st Cir. 2005), and substantial evidence supports the findings that the IJ and BIA drew from these reports.