# United States Court of Appeals
## For the First Circuit

No. 13-2046

ANTONIO D. MOURA,

Petitioner,

v.

ERIC H. HOLDER, JR., United States Attorney General,

Respondent.

PETITION FOR REVIEW FROM AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

William P. Joyce and Joyce & Associates P.C. on brief for petitioner.
Joanna L. Watson, Trial Attorney, Office of Immigration Litigation, Civil Division, Stuart F. Delery, Assistant Attorney General, Civil Division, and Ernesto H. Molina, Jr., Assistant Director, Office of Immigration Litigation, on brief for respondent.

July 14, 2014

LYNCH, **Chief Judge**.  On September 2, 2011, an Immigration Judge ("IJ") denied Antonio D. Moura's application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  The Board of Immigration Appeals ("BIA") dismissed Moura's appeal from the IJ's decision on July 22, 2013.  Moura petitions for review of the BIA's decision, contesting only its denial of his withholding of removal claim.  The basis for Moura's claim that his family was entitled to avoid removal was the threats made by his daughter's former boyfriend.  The BIA disagreed.  We deny the petition.

I.

Moura, a native and citizen of Brazil, came to the United States on September 5, 2000.[1]  The Department of Homeland Security initiated removal proceedings against him on February 18, 2009, charging him as unlawfully present in the United States.  See 8 U.S.C. § 1182(a)(6)(A)(i).  Moura conceded removability and applied for several forms of relief, including withholding of removal.  As to that claim, Moura alleged that he feared persecution in Brazil because his daughter's ex-boyfriend had persecuted him due to his membership in either one of two social groups: (1) the immediate family of his daughter, Elizandra Moura (Elizandra), or (2) people

_____

[1] Moura testified before an IJ that he arrived in Orlando, Florida in September 2000 on a visa.  The record does not provide other details as to Moura's arrival in the United States.

-2-

who help Brazilian women escape "violent relationships where they are viewed as property of their significant others."

Moura testified at a merits hearing before an IJ on September 2, 2011. The IJ found him generally credible save as to his testimony on a key point. We describe the relevant testimony and evidence.

In 1993 Moura's daughter Elizandra, then sixteen, started dating nineteen-year-old Nelton Silva De Oliveira (Silva). Moura disapproved of the relationship because he had heard that Silva was a drug dealer. He encouraged Elizandra to break-up with Silva. She eventually did.

After Elizandra ended her relationship with Silva in 1996, Silva started to follow Elizandra and threatened to kill her. As a result, Moura began taking Elizandra to and from school to protect her from Silva. Moura also reported Silva's threats against Elizandra to the local police. A translated statement from a local police officer submitted as evidence said Moura had told the police in 1996 that Silva had threatened to murder his daughter out of jealousy. The police officer's statement explained that the police could not issue a criminal complaint against Silva without a statement from Elizandra, the victim. Moura testified that he told Elizandra that she had to personally report Silva to the police but that she refused, out of fear.

In addition to verbal threats, Silva twice forced Elizandra to ride on a motorcycle with him, saying "if she could not belong to him, she would not belong to anyone else, and that her father's death was already predicted." On one of those forced rides, Silva caused an accident that broke Elizandra's leg. Local police took a statement from Elizandra with regard to the accident but she did not report the previous death threats.

Moura testified that Silva first threatened him personally in 1996, saying that "if he could not marry [Elizandra], [Moura] wold wake up dead with [his] mouth full of insects." Moura testified that Silva also said: "if he could not get married and have [Elizandra] with him always or forever, she would not belong to anyone else. . . . And if I tried to do something to separate them, for sure he would kill me." Moura could not remember the number of times Silva had threatened him but clarified that the "several threats" he had received were always by telephone. Silva had also called Moura's wife and told her she should prepare to become a widow.

In July 1997, Moura moved to Goiana, a town six hours away from the family's hometown, to find a new home for the family where they would be free from Silva. His family later joined him.

Moura testified that as soon as he had moved, Silva called to say he was going to kill him. About six months after the move, two men stabbed him in the stomach as he was leaving the

store where he worked. The attack happened very quickly, and he did not see who the attackers were. Nor did the attackers say anything to him. Moura reported the incident to the police; they said that they were unable to locate the perpetrators. Moura believes Silva was responsible for the attack, but could not state reasons to support his belief.

After the attack in Goiana, Moura moved to another neighborhood with his family. Moura said that between 1997 and 2000, a three year period, no one in his family had any personal contact with Silva, although Silva had called his wife and left threatening messages for him during this period.

Moura came to the United States in September 2000 because a friend gave him financial support for the journey and told him his family could live a peaceful life in the United States. Moura's wife joined Moura in the United States a couple of months later, as did Elizandra and her husband, whom Elizandra had married in October 2000.

Although it had been over a decade since Moura had any contact with Silva, Moura testified that he feared Silva would kill him if he returned to Brazil because Silva's criminal record, which was also submitted as evidence, indicated that Silva was still involved in criminal activities.[2] Moura had also been told from

_____

[2] Silva's criminal record shows he has been prosecuted and convicted of several crimes. Moura also testified that Silva had been to jail many times.

friends in Brazil that Silva asked about his whereabouts and had vowed to "destroy[]" him.

The IJ issued an oral opinion after he had listened to Moura's testimony and reviewed the record evidence. The IJ found Moura to be credible except for Moura's testimony that Silva was responsible for the stabbing he had suffered in Goiana. The IJ found there was no evidence, only conjecture, to substantiate that suspicion.

The IJ denied Moura's withholding of removal application and granted him voluntary departure. Moura had not shown he was a victim of past persecution on account of a statutorily protected ground. There was no nexus between Silva's actions and threats against Moura and a protected ground. Rather, the IJ found that Silva was motivated by his "possessiveness" of Elizandra, reasoning:

> It is quite clear that [Silva] had a personal dispute against [Elizandra] and the [petitioner]. The purpose of [Silva's] harming [Elizandra] and threatening [Moura] was not to punish either one of them for a belief or characteristic which they had which he sought to overcome, but merely to satisfy his own possessiveness. He repeatedly maintained that if he could not have [Elizandra], then no one would.

(emphasis added). Moura also had not established a well-founded fear of future persecution.[3]

---

[3] The IJ's denial of Moura's asylum and CAT claims are not at issue here.

Moura appealed to the BIA.  On July 22, 2013, the BIA dismissed the appeal, agreeing with the IJ that Silva's threats were not on account of a protected ground but rather "motivated by revenge and a personal dispute with [Moura] because [Moura's] daughter wanted to cease her relationship with [Silva]."  The BIA concluded that the law does not authorize withholding based on an applicant's "[f]ear of retribution over personal matters," and Moura had not shown he had suffered past persecution on account of a protected ground.

The BIA also agreed with the IJ that Moura had not established a well-founded fear of future persecution.  The BIA explained, "[Moura] departed Brazil in 2000.  There is no evidence in the record that [Silva] continues to hold any animosity against [Moura] or that he will seek to hurt the respondent upon his return to Brazil."

In addition, the BIA, citing Rebenko v. Holder, 693 F.3d 87 (1st Cir. 2012), determined that Moura's withholding claim failed because "the record does not indicate that the Brazilian government would not assist or protect [Moura] from [Silva]."  See id. at 92 ("[V]iolence by private citizens . . ., absent proof that the government is unwilling or unable to address it, is not persecution." (second alteration in original) (quoting Butt v. Keisler, 506 F.3d 86, 92 (1st Cir. 2007)) (internal quotation marks omitted)).  The BIA reinstated the IJ's grant of voluntary

departure for a period of sixty days.  The petition for review followed.

II.

"Where the BIA has deferred to or adopted the IJ's reasoning, we review the IJ's decision, as supplemented by the BIA." <u>Sam</u> v. <u>Holder</u>, 752 F.3d 97, 99 (1st Cir. 2014).  "We uphold the BIA's findings if they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" <u>Budiono</u> v. <u>Mukasey</u>, 548 F.3d 44, 48 (1st Cir. 2008) (quoting <u>Sharari</u> v. <u>Gonzales</u>, 407 F.3d 467, 473 (1st Cir. 2005)).  We will not reverse factual findings unless "any reasonable adjudicator would be compelled to conclude the contrary." <u>Restrepo</u> v. <u>Holder</u>, 676 F.3d 10, 16 (1st Cir. 2012) (quoting <u>Lin</u> v. <u>Gonzales</u>, 503 F.3d 4, 7 (1st Cir. 2007)) (internal quotation marks omitted).

To qualify for withholding of removal, the applicant must show by a clear probability that he will be persecuted on account of a protected ground upon repatriation. <u>Rotinsulu</u> v. <u>Mukasey</u>, 515 F.3d 68, 71 (1st Cir. 2008).  Moura does not dispute that, as a matter of law, harm resulting from a personal dispute or personal antagonism is not a basis for withholding of removal. <u>See</u> <u>id.</u> at 73 (citing the "well-settled rule that withholding of removal cannot be premised on what is essentially a personal dispute"); <u>Silva</u> v. <u>Ashcroft</u>, 394 F.3d 1, 6 (1st Cir. 2005); <u>Romilus</u> v.

-8-

Ashcroft, 385 F.3d 1, 6 (1st Cir. 2004) ("The [Immigration and Nationality Act] is not intended to protect aliens from violence based on personal animosity."). Rather, Moura contests the BIA's factual findings. Moura argues that Silva threatened him because: (1) he was part of Elizandra's nuclear family; and (2) he was a member of a social group defined as those who help Brazilian women escape violent relationships. He argues the BIA erred in concluding that Silva was motivated by jealousy and possessiveness of Elizandra, a personal matter, and not due to any immutable characteristics of the petitioner.

Here, ample evidence supports the BIA's finding. First, the threats were explicit as to Silva's motive, given Moura's testimony that Silva had threatened to kill him "if he could not marry [Elizandra]," and had repeatedly said that Elizandra would not belong to anyone but him. Relatedly, Silva's threats against Moura did not start until after Elizandra had ended their relationship. In addition, the statement of the local police force, submitted as evidence, said Moura had complained that Silva had threatened to murder his daughter out of "jealousy."

Moura has not pointed to any record evidence that would compel a different conclusion.[4] We will not disturb the BIA's

---

[4] If anything, Moura has mischaracterized the evidence. He states that Silva "targeted anyone who sought to keep Elizandra away from him," including Moura, Moura's wife, and Elizandra herself. The evidence is, however, that Silva threatened only Moura and Elizandra. Silva's phone calls to Moura's wife conveyed

finding that Moura feared harm resulting from a personal dispute, and so he has not suffered past persecution on account of a protected ground.[5]  See Costa v. Holder, 733 F.3d 13, 17 (1st Cir. 2013) (upholding BIA's findings where substantial evidence showed risk petitioner faced was personal and not due to membership in a particular social group); see also Rotinsulu, 515 F.3d at 73 (holding that withholding of removal claim fails where petitioner's evidence suggests alleged harm arose from a personal dispute between petitioner and his former lover's family).

Nor has Moura cast doubt on the BIA's conclusion that he has failed to establish a well-founded fear of future persecution. Not only has Moura not shown any nexus to a protected ground, but also there is scant evidence that Silva still intends to harm him. The last time Silva contacted Moura directly was in 1997.  Moura's unsubstantiated statements that family members in Brazil have said Silva occasionally inquires about him and has promised to destroy

_____

death threats against Moura and were not direct threats against his wife.
     As to Moura's claim that Silva targeted him because he was part of Elizandra's nuclear family, Moura points to no record evidence that Silva targeted either of Elizandra's two sisters, also members of that alleged social group.

     [5]  Even if Moura convinced us that Silva's motivation was on the basis of a protected ground, he would still have to show that the evidence compels a finding that the Brazilian government is unwilling or unable to address the violence he faces from a private citizen.  See Rebenko, 693 F.3d at 92.

him do not undermine the BIA's finding of a lack of evidence as to Silva's continued animosity toward Moura many years later.

Because the lack of nexus between Silva's conduct and a protected ground is fatal to Moura's withholding of removal claim, see Mayorga-Vidal v. Holder, 675 F.3d 9, 19 & n.5 (1st Cir. 2012), we need not address Moura's other claims of error or whether Moura has satisfied his burden of proof as to the other elements of withholding of removal.

III.

For the reasons stated, the petition for review is denied.

-11-